## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MERLINDA PEREA, AND**
**FRANCINE PUENTES, as Proposed**
**Co-Representatives of the Wrongful Death**
**Estate of JERRY PEREA**
**and ON BEHALF OF THE MINOR, BP,**

      **Plaintiff,**

**vs.**                                                  **No. CIV 13-263 RB-RHS**

**CITY OF ALBUQUERQUE,**
**ALBUQUERQUE CITY POLICE,**
**APD OFFICER DAVID BACA and**
**APD OFFICER ANDREW JARAMILLO**

      **Defendants.**

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REQUESTING DISMISSAL OF PLAINTIFF'S COMPLAINT WITH PREJUDICE, AND MEMORANDUM IN SUPPORT

**COME NOW**, Defendants City of Albuquerque, Non-suable entity "Albuquerque City Police," David Baca, and Andrew Jaramillo (hereinafter referred to as "Defendants"), by and through Assistant City Attorney Stephanie M. Griffin, and pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 12(c), and Fed. R. Civ. P. 56 and hereby state the following for Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint with Prejudice, and Memorandum in Support:

## INTRODUCTION

This case involves allegations as to whether the force used by Officers Baca and Jaramillo against decedent Jerry Perea on March 21, 2011 was excessive in light of clearly established law. It is the defense contention that the force used was reasonable under the totality of the circumstances and that neither defendant committed any clearly established constitutional

violation.  Therefore, it is the defense contention that Plaintiff's sole claim of excessive force fails as a matter of law against Defendants because Defendants are entitled to qualified immunity against Plaintiff's federal claim for excessive force.  It is unclear from Plaintiff's Third Amended Complaint [Doc. 21] as to whether Plaintiff has asserted a plausible claim under the New Mexico Tort Claims Act as there are no allegations that the Defendants immunity has been waived or that Defendants committed a battery under the Act.  Also, it is the defense contention that any such claim brought under the Act is time barred and that Plaintiff failed to comply with the notice provisions under the Act.  This motion is opposed.

## STANDARD OF REVIEW

The same standard of review to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is applied to a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). *See Atl. Richfield Co. v. Farm Credit Bank*, 226 .3d 1138, 1160 (10th Cir. 2000); *see also Park Univ. Enters., Inc. Am. Cas. Co. of Reading, Pa.,* 442 F.3d 1239, 1244 (10th Cir. 2006) (stating that, in reviewing a grant of judgment on the pleadings, a court will "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same"). In this regard, the complaint should be dismissed for failure to state a claim "unless it is beyond doubt that the plaintiff can prove no set of facts which support his claim which would entitle him to relief."  *Stidham v. Peace Officer Standards and Training,* 265 F.3d 1144, 1149 (10th Cir.2001).

Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(*quoting Bell Atl.*

*Corp v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he pleading standard Rule 8 announces ... demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. This contextual approach means comparing the pleading with the elements of the cause(s) of action. *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Further, this court must view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party. *Frye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1222 (10th Cir. 2008).

<u>**STATEMENT OF FACTS**</u>

The following statement of facts is being submitted for purposes of this motion only:

1.      On March 19, 2013, a complaint was filed in this cause but no personal representative had been appointed.  [See Doc. 1 (action brought by "Proposed Co-Personal Representatives") ]

2.      On March 20, 2013, a first amended complaint was filed and still no personal representative had been appointed.  [See Doc. 3 (action brought by "Proposed Co-Personal Representatives") ]

3

3.      On March 22, 2013, a second amended complaint was filed and still no personal representative had been appointed.  [See Doc. 5 (action brought by "Proposed Co-Personal Representatives") ]

4.      On May 14, 2013, a third amended complaint was filed and still no personal representative had been appointed.  [See Doc. 3 (action brought by "Proposed Co-Personal Representatives") ]

5.      A personal representative had not been appointed until August 27, 2013.  [See Doc. 19-1]

6.      On October 11, 2013, a fourth amended complaint was filed wherein it was alleged that Merlinda Perea and Francine Puentes had been appointed as co-personal representatives of the Estate of Jerry Perea.  [See Doc. 21. ¶ 1]

7.      The fourth amended complaint filed on October 11, 2013 lists "Albuquerque City Police" as a party and besides alleging that the City of Albuquerque is a municipality and that the Albuquerque Police Department is its department and that  "City of Albuquerque Police Department" is the employer of Officers Baca and Jaramillo, it does not contain any factual allegations or claims against the City of Albuquerque or the "Albuquerque City Police." [See Doc. 21]

8.      There are no allegations in the fourth amended complaint that Plaintiff complied with Section 41-4-16 of the New Mexico Tort Claims Act with respect to providing the City of Albuquerque notice of its intent to sue.  [See Doc. 21]

9.      With respect to the subject incident, on March 21, 2011, Co-Personal Representative Merlinda Perea called 911 during which she stated:  "Yes.  I am calling from 145 Mescalero Road, Northwest.  My son is on very bad drugs.  And he's been picked up before I

wish they would come and take him before he hurts us." [See Notice of Lodging - "Exhibit A" - 911 Recording at 00:03 – 00:14 to be submitted with Defendants' Notice of Lodging; "Exhibit B" – 911 Recording Transcript at 2:3-6]

10.     Ms. Perea also stated during the call:  "He threw something a while ago.  And I'm scared that he's just really going to come and hurt us."  [Exhibit A at 00:30-00:36; Exhibit B at 2:19-21]

11.     Officer Andrew Jaramillo and Officer David Baca were dispatched to the Ms. Perea's residence in response to the 911 call.  [See "Exhibit C" – Deposition of Andrew Jaramillo at 8:22-9:5 and "Exhibit D" – Deposition of David Baca at 6:16-25]

12.      The information that the officers had via the dispatch was that there was some type of verbal fight going on and that Ms. Perea's son, decedent Jerry Perea, had been throwing things inside of the residence.  Although the officers were advised that there were "negative weapons," there was information that there was a hazard warning placed on the residence located at 145 Mescalero Road alerting officers to use caution.  [Exhibit C at 12:6-13:2; 14:9-20]

13.     When Officers Jaramillo and Baca arrived at the at145 Mescalero Road residence, Officer Jaramillo contacted the 911 caller, Merlinda Perea, and her companion Fred Casaus who advised him that Jerry Perea had left the residence on a bicycle and that he was possibly on drugs and that they were afraid for his welfare because he had been acting up.  [Exhibit C at 17:10-14]

14.     After speaking with Ms. Perea and Mr. Casaus, Officers Jaramillo and Baca left the 145 Mescalero Road residence in search of Jerry Perea.  [Exhibit C at 22:21-24; Exhibit D at 13:1-20]

15.     Officer Jaramillo spotted Jerry Perea so he advised over radio that he had located him. [Exhibit C at 23:9-20]

16.    As Officer Jaramillo approached Mr. Perea in his marked police car, he observed Mr. Perea, who was on a bike, look back at his police car and then pedal a lot faster. These actions led Officer Jaramillo to believe that Mr. Perea was attempting to elude him. [Exhibit C at 23:18-25]

17.    Officer Jaramillo turned on his lights and sirens to get Mr. Perea's attention, Mr. Perea looked back again and instead of stopping, Mr. Perea went straight through to 4th Street on his bike causing a few motorists to slam on their brakes to avoid hitting him.  [Exhibit C at 24:7-15]

18.    Due to the information learned from Fred Casaus and Merlinda Perea that they were concerned for Jerry Perea's welfare and due to the careless manner in which Mr. Perea had entered onto 4th Street while riding his bicycle, Officer Jaramillo felt it necessary to detain Mr. Perea for his own safety.  [Exhibit C at 58:6-17]

19.    Mr. Perea continued through the intersection, and Officer Jaramillo was able to get ahead of him and place his police vehicle in front of him. [Exhibit C at 24:16-18]

20.    Mr. Perea then turned into a parking lot of a transmission shop located on 4th Street.  [Exhibit C at 24:18-21]

21.    Officer Jaramillo then exited his police vehicle and began to chase after Mr. Perea on foot while Mr. Perea was still on his bike. [Exhibit C at 29:12-23]

22.    Mr. Perea ended up near a fence where Officer Jaramillo pushed him into the fence and caused his bike to stop.  [Exhibit C at 29:21-30:8]

23.    As Officer Jaramillo attempted to grab Mr. Perea's hands, Mr. Perea pulled back his arm and lunged towards Officer Jaramillo and struck Officer Jaramillo in the chest with an object in his hand.  The object turned out to be a crucifix.  [Exhibit C at 30:11-23]

24.     Officer Baca arrived on scene to assist Officer Jaramillo into placing Mr. Perea into custody.  [Exhibit C at 32:12-14; Exhibit D at 18:11-13]

25.     As the officers attempted to handcuff Mr. Perea, Mr. Perea resisted so Officer Baca told Officer Jaramillo to use his Taser.  [Exhibit C at 33:1-11; Exhibit D at 18:22-25]

26.     The cycling of a Taser on a person can cause the person's muscles to contract at which *can* offer the effective incapacitation of the subject in the probe mode, or potential pain compliance in drive-stun mode.  [See Exhibit E – Rule 26 Expert Report of Dr. Gary Vilke at p. 7]

27.     When Officer Jaramillo first used the Taser, he used it in the probe mode, and it appeared to be ineffective against Mr. Perea. [Exhibit C at 33:11-17]

28.     Mr. Perea had grabbed and yanked the prongs from the Taser from his chest and had continued to resist being placed into custody.  [Exhibit C at 33:9-17; 36:9-12; Exhibit D at 19:14-22]

29.     Because the Taser was ineffective against Mr. Perea in the probe mode in that Mr. Perea still continued to resist, Officer Jaramillo used it in the contact mode as a pain compliance technique in order to help gain compliance from Mr. Perea.  [Exhibit C at 44:16-22]

30.     Mr. Perea was told multiple times to put his hands behind his back but Mr. Perea physically resisted instead of complying with these commands.  [Exhibit D at 20:19-24]

31.     During the struggle to get Mr. Perea into custody, Mr. Perea struck Officer Baca in the head multiple times with the crucifix he was holding.  [Exhibit C at 65:23-25; Exhibit D at 21:7-8]

32.     In all, the Taser was cycled ten times, once in the probe mode and nine times in the contact tase mode.  [Exhibit C at 45:15-17; 62:20-63:12]

33.     Mr. Perea was tased in his back area when the Taser was used in the contact mode.  [Exhibit C at 48:2-4]

34.     There were pauses in between each Taser cycle during which the officers attempted to take control of Mr. Perea's arms as he resisted being handcuffed. [Exhibit C at 62:20– 64:25; 65:1-9; 70:3-11]

35.     During the struggle with the officers, Mr. Perea pushed the officers and kept his arms underneath his body.  [Exhibit C at 65:12-15]

36.     After Mr. Perea resisted for approximately 2 minutes and 47 seconds, the officers were able to get both handcuffs on him.  [Exhibit D at 21:7-10] [See Notice of Lodging – Exhibit K, Lapel Video of Officer Andrew Jaramillo, Part 1 (Video Counter: 21: 29:21 – 21:32:08)]

37.     Civilian witnesses David Bradford, Ricardo Padilla, Albert Rivera, and Richard Sandoval, also saw Mr. Perea resist officer's efforts to take him into custody [See Exhibit F, Deposition of David Bradford at 19:5-15; Exhibit G, Deposition of Ricardo Padilla at 13:1-16:24; Exhibit H, Deposition of Albert Rivera at 10:9-11:7; Exhibit I, Deposition of Richard Sandoval at 13:7-16:25]

38.     Once both of Mr. Perea's hands were in handcuffs, Officer Jaramillo stopped using the Taser on him. [Exhibit C at 45:20-21]

39.     Once Mr. Perea was in handcuffs, Officer Baca contacted dispatch and requested that they send rescue and an ambulance since Mr. Perea had been tased.  [Exhibit D at 22:5-7]

40.     As the officers waited for rescue and ambulance personnel, Officer Baca noticed that Mr. Perea had stopped moving and that he appeared to be turning blue and gray so Officer Baca turned him onto his back, checked for a pulse, and checked for breathing.  [Exhibit D at 22:16-21]

41.     Officer Baca noticed that Mr. Perea was not breathing so Officer Baca told dispatch to have rescue "step on it" and he started to administer CPR.  [Exhibit D at 22:21-23]

42.     Officer Baca was able to revive Mr. Perea.  [Exhibit D at 22:24-25]

43.     When paramedics arrived on scene, Mr. Perea started kicking and spitting at them. He spit a mouthful of blood on the paramedic who was treating him and then Mr. Perea started banging his head on the asphalt.  [Exhibit C at 51:21-52:20; Exhibit D at 23:14-19]

44.     Since Mr. Perea was spitting and banging his head, Officer Baca had Officer Jaramillo go get a spit sock and Officer Baca retrieved some headgear to place on Mr. Perea's head.  [Exhibit C at 53:16-22; Exhibit D at 23:20-24]

45.     While Mr. Perea was still being treated by paramedics, he clenched his fists and kicked his feet and then he stopped moving and appeared to have stopped breathing so the paramedics administered CPR on him.  [Exhibit C at 55:16-56:1; Exhibit D at 24:9-23]

46.     Mr. Perea was pronounced dead at 11:08 a.m. on March 21, 2011 [See Exhibit J – Report of Findings by the Office of the Medical Investigator]

47.     Lapel video footage from Officer Jaramillo's lapel camera [Parts 1, 2, and 3 on the DVD] from the incident is being submitted for the Court's consideration as an exhibit in the defense Notice of Lodging (Doc. 49) [See Exhibit K to the Notice of Lodging]

48.     Lapel video footage from Officer Baca's lapel camera [Parts 1 and 2 on the DVD] from the incident is being submitted for the Court's consideration as an exhibit in the defense Notice of Lodging (Doc. 49)  [See Exhibit L to the Notice of Lodging]

## LEGAL ARGUMENT

**I.   DEFENDANTS JARAMILLO AND BACA ARE EACH ENTITLED TO QUALIFIED IMMUNITY AND ARE THEREFORE ENTITLED TO A DISMISSAL OF PLAINTIFF'S EXCESSIVE FORCE CLAIM PLED IN COUNT I**

9

### A.       Qualified Immunity Standard

In order for a plaintiff's claim to survive summary judgment for purposes of qualified immunity, the record must contain facts that rebut the presumption of an entitlement to qualified immunity. *See Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001) (emphasis added). For purposes of overcoming a defendant-officer's presumption of immunity, a plaintiff has the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity such that "every reasonable official would have understood that what he [was] doing" violated the law. *Ashcroft v. al-Kidd*, ____ U.S.____, 131 S.Ct. 2074, 2080, 2083 (2011). Failure on either qualified immunity element is fatal to the plaintiff's cause. Lower courts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808 (2009).

As to the constitutional inquiry, the question is whether the facts alleged, which are taken in the light most favorable to the non-moving party, show that the officer's conduct violated a constitutional right. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). The clearly established inquiry is more specific than whether the officer's conduct violated a constitutional right; the question is whether it would be clear to a reasonable officer that his or her conduct was unlawful under the circumstances he or she confronted. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999)(*citing Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Moreover, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir.

1992). "A necessary concomitant to the determination of whether the constitutional right is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *see also Bella v. Chamberlain*, 24 F.3d 1251 (10th Cir. 1994). For a right to be "clearly established," the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) because the salient question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Hence, the general rule of qualified immunity is intended to provide government officials with the ability to reasonably anticipate when their conduct may give rise to liability for damages. When conducting this clearly established inquiry, it is inappropriate for a court to define a clearly established law at a high level of generality. *See Brosseau v. Haugen*, 543 U.S. 194, 198-199, 125 S.Ct. 596 (2004) (per curiam); *Wilson,* 526 U.S. at 615.

**B.     Plaintiff's Excessive Force Claim in Count I**

Excessive force claims are evaluated using the Fourth Amendment's standard of objective reasonableness, which is judged from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  The constitutional question of whether an officer's use of force is reasonable is measured "from the perspective of a reasonable officer on the scene," because officers are sometimes "forced to make split-second judgments" in uncertain and dangerous circumstances. *Id.*   There is no precise formula to apply in making this assessment, but factors to consider include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Id.*  As with all reasonableness inquiries, the touchstone is the totality of the circumstances. *Id.*

Officers are not required to be correct in their assessment of the danger presented by the situation, only that their assessment be objectively reasonable. *Saucier,* 533 U.S. at 205 ("If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.").  Indeed, even "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back ... the officer would be justified in using more force than in fact was needed." *Id.*  What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time." *Phillips,* 422 F.3d at 1080.   The Tenth Circuit said it best when they stated: "It is with reluctance that we second-guess the split-second decisions of trained officers reacting to difficult situations in the line of duty. We are not well-suited to act as a police supervisory board, making finely calibrated determinations of just what type of misbehavior justifies just what level of response." *Cordova v. Aragon***,** 569 F.3d 1183, 1190 (10th Cir. 2009).  *See also Harman v. Pollock*, 586 F.3d 1254, 1263 (10th Cir. 2009) ("[Courts] must defer to trained law enforcement personnel, allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them ....")

### 1.  The push by Officer Jaramillo was a reasonable use of force based upon the totality of circumstances.

One of the *Graham* factors for this Court to weigh is the severity of the crime at issue. *See Graham*, 490 U.S. at 396-97.  In the instant case, the information that the officers had via the dispatch was that there was some type of verbal fight going on and that Ms. Perea's son, decedent Jerry Perea, had been throwing things inside of the residence.  Although the officers

were advised that there were "negative weapons," there was information that there was a hazard warning placed on the residence located at 145 Mescalero Road alerting officers to use caution. [Exhibit C at 12:6-13:2; 14:9-20]  When the officers arrived at the 145 Mescalero residence, Officer Jaramillo learned from Fred Casaus and Merlinda Perea that they wanted officers to locate Mr. Perea because he was "acting up." [Exhibit C at 17:10-14] As Officer Jaramillo approached Mr. Perea in his marked police car, he observed Mr. Perea, who was on a bike, look back at his police car and then pedal a lot faster. [Exhibit C at 23:18-25] These actions led Officer Jaramillo to believe that Mr. Perea was attempting to elude him. See id.  Officer Jaramillo then turned on his lights and sirens to get Mr. Perea's attention, but Mr. Perea looked back again and instead of stopping, Mr. Perea went straight through to 4th Street on his bike without yielding to oncoming traffic and thereby causing motorists to slam on their brakes to avoid hitting him.  [Exhibit C at 24:7-15]

Based upon the factors set forth in the preceding paragraph, Officers Jaramillo and Baca had reasonable suspicion to believe that Mr. Perea was involved in a domestic dispute with his mother, Merlinda Perea, and that he needed to be placed into protective custody which the officers had a legal obligation under New Mexico law to investigate.  *See* NMSA § 29-1-1 ("It is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer…" ); NMSA § 40-13-7(B) ("A local law enforcement officer responding to the request for assistance shall be required to take whatever steps are reasonably necessary to protect the victim from further domestic abuse[1]…"); NMSA § 43-1-10(A)(3)( "A peace officer may detain and transport a person for emergency mental health evaluation and care

---

1 *See* NMSA § 40-13-2 (D) defining  "domestic abuse"

in the absence of a legally valid order from the court only if…the peace officer, based upon the peace officer's own observation and investigation, has reasonable grounds to believe that the person, as a result of a mental disorder, presents a likelihood of serious harm to himself or herself or to others and that immediate detention is necessary to prevent such harm.") Also, given that officers had information that his mother and her companion were concerned for his welfare and given the manner in which he was riding through traffic, the officers also had reason to seize him in exercise of their community care-taking functions. *See Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996)("The state has a legitimate interest in protecting the community from the mentally ill and in protecting a mentally ill person from self-harm."); *United States v. Merritt*, 695 F.2d 1263, 1274 (10th Cir. 1982)( "Whenever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk that anyone will get hurt." ); *see also Novitsky v. City Of Aurora*, 491 F.3d 1244, 1253-54 (10th Cir. 2007) (Mr. Novitsky lying in the fetal position in the back of a parked car in response to a "man down" call, we conclude these actions were a reasonable exercise of their community caretaking functions.) ; *United States v. Garner*, 416 F.3d 1208, 1212–16 (10th Cir.2005) (holding that an officer justifiably detained an individual whom he encountered responding to a report of a "man down, said to be unconscious in a half sitting, half slumped over position for several hours")

Under the circumstances which Officer Jaramillo attempted to detain Mr. Perea, pushing him in order to effect the detention was not unreasonable, especially since Mr. Perea attempted to elude him. *See, e.g., Segura v. Jones*, 259 F. App'x 95, 104 (10th Cir. 2007) (Finding that officer who allegedly pushed and handcuffed plaintiff who was being detained in a shoplifting investigation was entitled to qualified immunity with respect to her excessive force claim);

*Thompson v. City of Lawrence, Kan.,* 58 F.3d 1511, 1517 (10th Cir. 1995)(holding objectively reasonable for the officers to temporarily restrain female who was being detained and that excessive force was not used when she was shoved to the floor with a weapon drawn on her and then handcuffed)

There was also probable cause to that Mr. Perea had committed assault; eluding; and traffic offenses. *See* NMSA §§ 30-3-1; 30-3-12; 30-22-1; 66-3-702; 66-3-705; 66-7-330; 66-7-328; 66-7-345; 66-8-114; City of Albuquerque Code of Ordinances[2] § 8-3-3-4(B) ("Every person riding a bicycle upon a roadway shall be subject to all the duties applicable to the drivers of motor vehicles, except as otherwise expressly provided in this Traffic Code…"); § 8-3-3-5(A) ("Any person operating a bicycle shall obey the instructions of official traffic control signals, signs, and other control devices applicable to vehicles, unless otherwise directed by a police officer. "); § 8-2-1-13 (Careless Driving); § 8-2-1-20(" No driver of a motor vehicle shall willfully fail or refuse to bring his vehicle to a stop, or shall otherwise flee or attempt to elude a pursuing police vehicle when given a visual or audible signal to stop…"); § 8-2-1-23 (" No person driving a motor vehicle shall fail to give his full attention to the task of driving and to keep a proper lookout…"); § 8-2-1-34 (A)("The driver of a vehicle approaching or entering an intersection shall yield the right-of-way to a vehicle which has entered the intersection from a different roadway.") An officer may arrest an individual if there is probable cause to believe that the offender has committed even a very minor criminal offense in the officer's presence. *Atwater v. City of Lago Vista,* 532 U.S. 318, 322 (2001)(finding that there was probable cause to arrest the plaintiff for a traffic offense)  In making an arrest, officers may "use some degree of physical coercion or threat thereof to effect it." *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001)

---

2  The City of Albuquerque Code of Ordinances can be found at :
http://www.amlegal.com/nxt/gateway.dll/New%20Mexico/albuqwin/cityofalbuquerquenewmexicocodeofordinanc?f
=templates$fn=default.htm$3.0$vid=amlegal:albuquerque_nm_mc

(finding that officer who kicked the plaintiff's foot very hard causing a bone spur injury did not

use excessive force)

 The remaining factors in the *Graham* analysis are whether Mr. Perea was an immediate

threat to the safety of the officers or others and whether he was actively resisting arrest or

attempting to evade arrest by flight." *See Graham*, 490 U.S. at 396-97.  Although neither Officer

Jaramillo nor Baca had information that Mr. Perea was armed, they did have information that

there was a hazard warning.  Also, Mr. Perea eluded Officer Jaramillo even after Officer

Jaramillo turned on his lights and siren.

Finally, a claim for excessive force requires some actual injury that is not de minimis, be

it physical or emotional. *See Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007).  There is

no evidence in the record that Mr. Perea suffered any injury from the push that was beyond de

minimus.   Therefore, it is clear that this aspect of Plaintiff's excessive force claim fails as a

matter of law. *See id.*

2. **The use of the Taser and leverage techniques to handcuff Mr. Perea was a reasonable use of force based upon the totality of circumstances.**

During the struggle to handcuff Mr. Perea after Officer Jaramillo pushed him from his

bike, Mr. Perea pulled back his arm and lunged towards Officer Jaramillo and struck Officer

Jaramillo in the chest with a crucifix.  [Exhibit C at 30:11-23] Mr. Perea also physically resisted

being places into custody. [Exhibit C at 33:1-11; Exhibit D at 18:22-25]  Consequently, the Taser

was used in effort to get Mr. Perea to comply and/or assist the officers in controlling him so they

could handcuff him.  Mr. Perea was also told multiple times to put his hands behind his back but

Mr. Perea physically resisted instead of complying with these commands.  [Exhibit D at 20:19-

24] During the struggle to get Mr. Perea into custody, Mr. Perea struck Officer Baca in the head

multiple times with the crucifix he was holding.  [Exhibit C at 65:23-25; Exhibit D at 21:7-8]  As

16

evident from the pauses in between each Taser cycle, Mr. Perea was given an opportunity to comply in between cycles.  [Exhibit C at 62:20– 64:25; 65:1-9; 70:3-11] Consequently, in addition to the crimes that he had already committed, Mr. Perea also committed the crimes of battery and resisting during the struggle with the officers.  *See* NMSA §§ 30-3-4; 30-22-24; 30-22-1; City of Albuquerque Code of Ordinances § 12-2-2 (Battery); § 12-2-19 (Resisting, obstructing or refusing to obey).

Weighing the *Graham* factors once again, Mr. Perea became physically combative as soon as officers attempted to take him into custody in that he resisted and battered each officer. He also disregarded their commands.  Therefore, given the nature of these crime, the threat he posed to the officers by battering  them with the crucifix and resisting their efforts to restrain him, it was reasonable to tase Mr. Perea and use leverage techniques in order to control him. *See, e.g., Mecham v. Frazier,* 500 F.3d 1200, 1205 (10th Cir. 2007)(" Mecham's disregard for the officers' instructions, the length of the encounter, and the implausibility of Mecham's rationale for not cooperating, lead us to conclude that the officers'use of force was justified in these circumstances."); *Hinton v. City of Elwood,* 997 F.2d 774, 776-77 (10th Cir. 1993)(no excessive force for officers' use of an "electrical stun gun" on a man who was physically resisting officers and who officers had warned that he would be placed under arrest if he had one more outburst.); *Hagans v. Franklin Cnty. Sheriff's Office,* 695 F.3d 505, 511 (6th Cir. 2012)(officer did not violate clearly established law when he tried—unsuccessfully, it turns out—to subdue Hagans with the taser. );  *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (in a "difficult, tense and uncertain situation" the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force."); *Crowell v. Kirkpatrick,* 400 Fed.Appx. 592, 595 (2d Cir.2010) (finding use of taser reasonable in

part because protesters were actively resisting their arrest at the time they were tased by the officers and *Pickering v. City of Oklahoma City*, 2007 WL 2693171 (W.D. Okla)(finding no excessive force where plaintiff was tased four times)

### C.   No Clearly Established Constitutional Violation

Qualified immunity shields an officer from suit when the officer makes a decision that, even if constitutionally deficient, the officer reasonably misapprehends the law governing the circumstances the officer confronted. *Saucier*, 333 U.S. at 206. (qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force'"). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau*, 543 U.S. at 198.  In *Saucier*, the United States Supreme Court said that it is important to emphasize that the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 333 U.S. at 201.  In *Ashcroft*, the Supreme Court went further to say that this inquiry means that "*every* reasonable official would have understood that what he [was] doing" violated the law. *Ashcroft*, 131 S.Ct. 2074, 2080, 2083 (emphasis added).  In this regard, the clearly established law which existed on March 21, 2011 would *not* have put Officer Jaramillo or Officer Baca on notice that their conduct allegedly amounted to a constitutional violation.

Prior to March 21, 2011, the use of the taser has been held to be a reasonable use of force when a person is actively resisting.  *See, e.g., Hinton,* 997 F.2d at 776-77;  *Hagans,* 695 F.3d at 511;  *Draper,* 369 F.3d at 1278; *Crowell v. Kirkpatrick,* 400 Fed.Appx. at 595;  *Pickering*, 2007

WL 2693171.   Defendants have been unable to locate any clear weight of authority which holds otherwise.   Indeed, the Tenth Circuit said in 2013 *Wilson v. City of Lafayette*, 510 F. App'x 775, 777 (10th Cir. 2013) *cert. denied*, 134 S. Ct. 164, 187 L. Ed. 2d 42 (U.S. 2013):

> Turning first to the published cases from this and other circuits and the Supreme Court, none would have clearly alerted a reasonable officer in August 2006 that the conduct at issue in this case amounted to constitutionally excessive force. To the contrary, as the Sixth Circuit held after conducting an exhaustive survey of relevant cases from across the country, "prior to May 2007 (and for several years after), no case in any circuit held that officers used excessive force by tasing suspects who were actively resisting arrest, even though many of them ... were suspected of innocuous crimes, posed little risk of escape and had not yet physically harmed anybody." *Hagans v. Franklin Cnty. Sheriff's Office,* 695 F.3d 505, 511 (6th Cir.2012). This class of cases undoubtedly embraces ours: Mr. Wilson was resisting arrest by fleeing from officers after they identified themselves—even if the crime of which he was suspected was not itself a violent one, he was likely to be apprehended eventually, and he hadn't harmed anyone yet.

Therefore, given that the Tenth Circuit said that the law was not clearly established in 2013 that tasing a suspect who is actively resisting amounts to excessive force, Officers Jaramillo and Baca certainly would not have been on notice that their alleged conduct on March 21, 2011 was an excessive use of force.  *See id.*  Likewise, given the holdings in *Saucier*, 533 U.S. 194, 209 and in *Cortez,* 478 F.3d 1108, 1129; *Segura*, 259 F. App'x at 104*; Gross*, 245 F.3d at 1158, Officer Jaramillo would not have been on notice that he allegedly violated clearly established law when he pushed  Jerry Perea  from his bicycle.

## II.   PLAINTIFF'S WRONGFUL DEATH CLAIM UNDER THE TORT CLAIMS ACT IS TIME BARRED

Section 41-4-15 requires that a suit seeking relief under the New Mexico Tort Claims Act ("NMTCA") be filed within two years of the occurrence.  *See Dutton v. McKinley County Bd. of Comm'rs*, 1991 NMCA 130, ¶13 113 N.M. 51, 822 P.2d 1134 (*citing Cozart v. Town of Bernalillo*, 99 N.M. 737, 663 P.2d 713 (Ct.App.1983)). Section 41-4-15A states:

Actions against a governmental entity or a public employee for torts
shall be forever barred, unless such action is commenced within two years
after the date of occurrence resulting in loss, injury or death, except that a
minor under the full age of seven years shall have until his ninth birthday in
which to file. This subsection applies to all persons regardless of minority or
other legal disability.

NMSA 1978, § 41-4-15A.  "[A] cause of action brought under Section 41-4-15(A) will accrue

regardless of whether or not the plaintiff is aware of the full extent of his or her injury." *Maestas*

*v. Zager*, 2007 -NMSC- 003, ¶ 22, 141 N.M. 154, 152 P.3d 141.  In the instant action, decedent

was pronounced dead on March 21, 2011 [See Exhibit J].  A claim under the Wrongful Death

Act is required to be brought by and in the name of the personal representative of the deceased

person. *See* NMSA 1978 § 41-2-3.  At the time the complaint was initially filed in the instant

action on March 19, 2013, no personal representative had been appointed.  [See Doc. 1 ( action

brought by "Proposed Co-Personal Representatives") ]  Even when the Estate filed its first

amended complaint, second amended complaint, and third amended complaint on March 20,

2013, March 22, 2013, and on May 14, 2013 [See Docs 3, 5 and 6], there was still no personal

representative appointed.  On July 23, 2013, Defendants filed a motion to dismiss the complaint

due to lack of standing since no personal representative had been appointed.  [See Doc. 13]  A

personal representative was subsequently appointed on August 27, 2013 [See Doc. 19-1] and the

Estate's fourth amended complaint was not filed until October 11, 2013 [See Doc. 21].

"[B]efore a federal court can consider the merits of a legal claim, the person seeking to

invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v.*

*Arkansas*, 495 U.S. 149, 154 (1990).  In this regard, every cause of action must be brought by the

real party in interest.  *See* Fed. R. Civ. P. 17(a).  Therefore, because at the time this action was

filed on March 19, 2011, it had not been brought by a duly appointed personal representative as

the real party in interest, there was no jurisdiction over Estate's complaint and the complaint was

therefore a nullity.  *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456

U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (Parties cannot confer federal jurisdiction

when it is lacking.); *Boeing Wichita Credit Union v. Wal–Mart Real Estate Business Trust,* 370

F.Supp.2d 1128, 1129 (D.Kan.2005)(See If a "court lacks subject matter jurisdiction, all rulings

are a nullity, lacking any force and effect.") Once the action had been filed by a duly appointed

Personal Representative on October 11, 2013, the two year statute of limitations had already

passed.  Accordingly, the Estate's claims under the NMTCA are time barred.

## III.    DEFENDANTS' IMMUNITY HAS NOT BEEN WAIVED FOR PLAINTIFF'S WRONGFUL DEATH CLAIM UNDER THE TORT CLAIMS ACT

Potential tort liability of a governmental entity and its employees is limited by the

specific provisions set out under the NMTCA.  *Pemberton v. Cordova*, 105 N.M. 476, 477, 734

P.2d 254, 255 (Ct. App. 1987).  Officer Jaramillo and Officer Baca's immunity has not been

waived under the NMTCA.  Section 41-4-12 of the NMTCA sets forth the specific torts for

which immunity has been waived for law enforcement officers.  This section waives immunity

for various torts, generally intentional torts, "caused by law enforcement officers while acting

within the scope of their duties."  *Bober v. New Mexico State Fair*, 111 N.M. 644, 653, 808 P.2d

614 (1991).  In the instant case, Officer Jaramillo and Officer Baca's immunity has not been

waived because "excessive force" is not a tort listed under Section 41-4-12 for which immunity

has been waived.  There are also no factual allegations in the complaint [Doc. 21] that they

unlawfully touched or applied force to Mr. Perea. *See* § NMSA 30-3-4 and *State v. Ortega,*

1992-NMCA-003, ¶¶ 9-12, 113 N.M. 437, 827 P.2d 152 (quoting *Restatement (Second) of Torts*

§ 18 (1965))("An actor is subject to civil liability for battery if 'he [or she] acts intending to

cause a harmful or offensive contact with the person of the other or a third person, or an

imminent apprehension of such a contact, and ... an offensive contact with the person of the other

directly or indirectly results.' ").   Even assuming that Estate intended to plead a battery claim

under Section 41-4-12, the officers' immunity still has not been waived in this regard, because as

already illustrated herein, their actions were lawful in using force against Mr. Perea and they

acted in good faith.  *See Mead v. O'Connor*, 66 N.M. 170, 173, 344 P.2d 478, 479-80 (1959)

("Officers, within reasonable limits, are the judges of the force necessary to enable them to make

arrests or to preserve the peace. …When acting in good faith, the courts will afford them the

utmost protection. . .") Therefore, Officers Jaramillo and Baca are entitled to summary judgment

against Plaintiff's wrongful death claim brought under the NMTCA because their immunity has

not been waived under Section 41-4-12.

## IV.   THE CITY OF ALBUQUERQUE AND "ALBUQUERQUE CITY POLICE" AND "OFFICIAL CAPACITY CLAIMS" SHOULD BE DISMISSED

It is unclear as to who the Estate intends to name as a party by naming "Albuquerque

City Police" as there is no such legal entity or department.  Presumably Plaintiff intended to

name the Albuquerque Police Department as a party this action.  Even so, the department cannot

be so named because like "Albuquerque City Police" it is not a suable entity.  Neither the

Albuquerque Police Department nor the "Albuquerque City Police" is a "person" for purposes of

Section 1983 because the department is an administrative agency as opposed to a separate legal

entity which operates independently of the City of Albuquerque.  Section 1983 claims have been

routinely dismissed where liability is sought *directly* upon municipal police departments.  *See,

e.g., Martinez v. Winner,* 771 F. 2d 424, 444 (10th Cir. 1985)(Section 1983  claims dismissed

because City of Denver Police Department not a separate suable entity); *Henry v. Albuquerque

Police Dept. et al* 00 CV 00719 JEC-LAM [Doc. 33 filed on 4/21/2001](*citing Gonzales v.

Morrow*, No. CIV 93-1216 (D.N.M. filed October 25, 1994);*Romero v. City of Albuquerque*,

Case 1:00-cv-00719-JEC-LAM No. CIV 94-832 (D.N.M. filed October 4, 1994); *Flores v. City

*of Albuquerque*, No. CIV 92-46 (D.N.M. filed May 28, 1993); *Atencio v. City of Albuquerque*,

No. CIV 91-57 (D.N.M. filed August 27, 1991); *Howard v. City of Albuquerque*, No. CIV 91-

1019 (D.N.M. filed July 12, 1991)); *Stump v. Gates,* 777 F.Supp. 808, 815 (D.Colo.1991)(*citing*

*Boren v. City of Colorado Springs*, 624 F. Supp. 474, 479 (D. Colo. 1985)  (city's police

department, as merely the vehicle through which city fulfills its policing functions, not a proper

party); *Stratton v. Boston,* 731 F. Supp. 42, 46 (D. Mass. 1989)  (action dismissed as against city

police department that is not an independent legal entity); *Reese v. Chicago Police Dept.,* 602 F.

Supp. 441, 443 (N.D. Ill. 1984) (Chicago Police Department and Cook County Attorney's Office

have no legal existence independent of city and county, and therefore are not suable entities).

With regard to Plaintiff's state law claims, the case of *Abalos v. Bernalillo County*

*District Attorney's Office, et al.*, 105 N.M. 554, 559, 734 P.2d 794, 799 (Ct. App. 1987) provides

guidance with respect to whether the Albuquerque Police Department is a properly named party.

In *Abalos, supra,* the plaintiff tried to sue the Bernalillo County Detention Center and the City of

Albuquerque based on allegations stemming from the acts of Detention Center employees.  To

determine which agency should be named as a party to the action the court adopted the following

standard:

> To name a particular entity in an action under the Tort Claims Act
> requires two things: (1) a negligent public employee who meets one
> of the waiver exceptions under Sections 41-4-5 to-12; and (2) an
> entity that has immediate supervisory responsibilities over the
> employee.  If a public employee meets an exception to
> immunity, then the particular entity that supervises the employee
> can be named as a defendant in an action under the Tort Claims Act.
> If the city or state directly supervises the employee, then the city
> or state can be named.

*Id*.  In applying this standard, the Court of Appeals found that "the City is not a remote actor;

rather according to its own admission, it is the particular agency that operates the detention

center and it would be the governmental agency responsible for the alleged harm. Accordingly, BCDC although perhaps not a separate agency should be dismissed from the lawsuit." *Id..* In the instant action, Plaintiff has alleged that the City of Albuquerque Police Department is the employer of Officers Baca and Jaramillo; however, it is the City of Albuquerque only which is the employer of these two officers. Pursuant to Section 41-4-4 of the New Mexico Tort Claims Act, the City of Albuquerque as a governmental entity[3] is responsible for defending and paying any settlement or judgment against a City employee for alleged violations under the New Mexico Tort Claims Act and/or United States Constitution. Therefore, it is clear that the City of Albuquerque and not the Albuquerque Police Department is the properly named party to this suit.

The City of Albuquerque, "Albuquerque City Police," and the official capacity claims should also be dismissed because there are no Section 1983 claims pled against it. With respect to the "official capacity claims" brought against Officers Jaramillo and Baca, it is unnecessary to name an individual in his or her official capacity when the municipality itself has also been named. This is the case because a Section 1983 action is appropriately pleaded against a municipality *either* by naming the municipality itself or by naming a municipal official in his or her official capacity. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58 (1989); *Kentucky v. Graham* 473 U.S. 159, 166 (1985); *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985); *Monell v. New York City Dept. of Soc. Serv.,* 436 U.S. 658, 690 n. 55 (1978). Consequently, naming either an official in his or her official capacity or the municipality is sufficient. Naming both is redundant. *See Vondrak v. City of Las Cruces*, No. CIV-05-172, 2009 WL 1300945, *2 (D.N.M. Mar. 30, 2009).

---

3 Governmental entity is defined, in relevant part as "local public body" means all political subdivisions of the state. NMSA 1978, § 41-4-3

The same holds true with respect to Plaintiff's state law claims, if any, brought against Officers Jaramillo and Baca in their "official capacity" because a suit against City officials under the Tort Claims Act is not a suit against them in their official capacities. "Although the alleged misconduct of the defendants occurred in the course of their official duties, the distinction between a state official in an official capacity and a state official in an individual capacity does not turn on the type of conduct involved. Rather, it turns on procedural considerations and the relief sought." *Ford v. New Mexico Dep't of Pub. Safety*, 891 P.2d 546, 552 (N.M. Ct. App. 1994). Thus, the nature of the liability of an official in a suit under the New Mexico Tort Claims Act "is essentially the same" as the nature of the liability of the official sued under Section 1983: "[b]oth are sued for misconduct in office. In both, the defendant is the individual, not the office." Id.  Further, the New Mexico Court of Appeals has held that waiver in Section 41-4-5 to -12 of the New Mexico Tort Claims Act contemplates suing the immediate supervisory *entity* of the public employee involved as opposed a supervisor named in his or her official capacity. *See Abalos,* 105 N.M. at 559, 734 P.2d at 799.

Also, the City of Albuquerque may not be held liable under Section 1983 solely because it is an employer as is alleged in the complaint.  *See Monell v. Department of Social Services*, 436 U.S. 658, 691-92 (1978).  Besides an allegation that it is a municipality and the employer of these officers, there are no specific factual averments or claims asserted against the City of Albuquerque and/or the "Albuquerque City Police."   Nevertheless, to the extent, if any, Plaintiff has attempted to assert a state law claim of battery against the City, there is no waiver of immunity for these claims because: (1) Plaintiff there are no allegations that Plaintiff  serve a Tort Claims Notice in accordance with all of the requirements under Section 41-4-16 of the NMTCA and (2) the City's immunity has not been waived under the NMTCA since as explained

herein neither Officer Baca nor Jaramillo's immunity has been waived.  Therefore, the City is

not liable under a theory of *respondeat* superior.  Thus, the Court is free to dispose of Plaintiff's

wrongful death claim against the City of Albuquerque and/or the "Albuquerque City Police"

under either premise.

## **CONCLUSION**

As the Tenth Circuit said in *Wilson*, 510 F. App'x at 780:

> We sympathize with the Wilsons over their terrible loss. But the Supreme Court
> has directed the lower federal courts to apply qualified immunity broadly, to
> protect from civil liability for damages all officers except "the plainly incompetent
> or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341, 106
> S.Ct. 1092, 89 L.Ed.2d 271 (1986), in order that officers might not be unduly
> "inhibit[ed] ... in performing their official duties," *Medina v. Cram*, 252 F.3d 1124,
> 1127 (10th Cir.2001).

The same holds true in the instant action.  There can be no doubt that the death of a family

member is a terrible loss; however, the death which occurred after Mr. Perea was treated by

paramedics was not caused by any excessive use of force by either Officer Jaramillo or Officer

Baca.  **WHEREFORE,** based upon the foregoing arguments and authorities cited herein, City

Defendants request that this Court grant City Defendants' Motion to Dismiss and for Summary

Judgment Requesting Dismissal of Plaintiff's Complaint, and order all other relief the Court

deems necessary.

Respectfully submitted,

CITY OF ALBUQUERQUE
David Tourek, City Attorney

/s/ Stephanie Griffin
Assistant City Attorney
P. O. Box 2248
Albuquerque, New Mexico 87l03
 (505) 768-4500

*Attorney for Defendants*

26

I hereby certify that a true copy
of the foregoing was served via
Notice of Electronic Filing to:

Santiago Juarez
1822 Lomas Blvd. NW
Albuquerque, NM 87104

Cheryl K. McLean
914 Lomas Blvd. NW
Albuquerque, NM 97102-1954

*Attorneys for Plaintiffs*

on this 22nd  day of  August, 2014.

/s/ Stephanie M. Griffin, Assistant City Attorney