```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
 2

 3   MERLINDA PEREA, AND FRANCINE
     PUENTES, Co-Personal
 4   Representatives of the
     Wrongful Death Estate of
 5   JERRY PEREA and ON BEHALF
     OF THE MINOR, BP,
 6
                  Plaintiffs,
 7                                         No. CIV 13-263 RB-RHS
         vs.
 8
     CITY OF ALBUQUERQUE,
 9   ALBUQUERQUE CITY POLICE,
     APD OFFICER DAVID BACA and
10   APD OFFICER ANDREW JARAMILLO,

11            Defendants.

12
                 DEPOSITION OF ANDREW JARAMILLO
13
                         July 30, 2014
14                         9:37 a.m.
             Paul Baca Professional Court Reporters
15           500 4th Street, Northwest, Suite 105
                 Albuquerque, New Mexico 87102
16

17
                 PURSUANT TO THE FEDERAL RULES OF CIVIL
18   PROCEDURE, this deposition was:

19
20   TAKEN BY:     SANTIAGO E. JUAREZ
                   Attorney for the Plaintiffs
21
22   REPORTED BY:  Mary C. Hankins, CCR, RPR
                   New Mexico CCR #20
                   Paul Baca Professional Court Reporters
23                 500 4th Street, Northwest, Suite 105
                   Albuquerque, New Mexico 87102
24                 (505) 843-9241

25
```

EXHIBIT C

1  part of the emergency response team, and whenever there
2  is a police shooting, we come out just for perimeter
3  stuff.
4  Q. Okay. Now, you know that we're here in
5  reference to a lawsuit by the family of Jerry Perea
6  against the City of Albuquerque and the city police?
7  A. Yes, sir.
8  Q. Do you recall the date of the incident?
9  A. I do, sir.
10 Q. Okay. Now, did you review anything before
11 coming here today? Did you review any of your
12 statements or any depositions or reports given to the
13 police before you came today?
14 A. Yes, sir.
15 Q. What did you have an opportunity to review?
16 A. First of all, the video of the incident from
17 the lapel camera that was on my person and the
18 deposition of the criminal interview with me during
19 the -- during the incident.
20 Q. Now, did those -- did those items help you
21 refresh your memory as to what happened that day?
22 A. For the most part, yes.
23 Q. And how long before this deposition did you
24 review those materials?
25 A. Yesterday.

1  Q. And where did you review those at?
2  A. With my attorney.
3  Q. On the date of the incident -- do you recall
4  what the date is now? You can refer to your notes or
5  anything. I don't care.
6  A. I don't remember the exact date.
7      MS. GRIFFIN: Maybe March 21st of 2011.
8  A. March 21st, 2011.
9  Q. (BY MR. JUAREZ) Okay. Got it. 2011.
10     Now, in regards to that particular date and
11 that particular event -- I'll have this marked because I
12 don't understand it. You might help me. Let's mark
13 this as Plaintiffs -- I don't know.
14     MR. JUAREZ: What did you use? Letters?
15     MS. GRIFFIN: Oh, I used numbers, but you
16 can use numbers.
17     MR. JUAREZ: Can I use numbers, too, or do
18 I have to use letters?
19     MS. GRIFFIN: You can use numbers.
20     MR. JUAREZ: So being marked as Plaintiffs'
21 Exhibit 1, as stipulated, is the disk of the video cam
22 provided to Plaintiffs by the Defendants of the lapel
23 cam on March 21st, 2011.
24 Q. (BY MR. JUAREZ) Plaintiff's Exhibit Number 2,
25 could you identify what that is?

1  A. This is the CAD for the incident that occurred.
2  Q. And what does CAD mean?
3      (Exhibit Numbers 1 and 2 marked.)
4  A. It's the -- it's a log of events that is
5  forwarded to the officer during the incident to update
6  us on what was going on.
7  Q. I'd like you to look at that. You know, flip
8  through it real quick, like, and tell me if this appears
9  to be the CAD for the March 21st event leading up to
10 your contact with Mr. Perea.
11 A. Yes, sir.
12 Q. Now, the information you're receiving from the
13 CAD, is that something that's coming verbal over the
14 radio?
15 A. Yes.
16 Q. So if we look at page -- what we'll call page
17 1, which is the first page, and it says "9:47:22,"
18 correct?
19 A. Yes, sir.
20 Q. Could you summarize what that information --
21 did you receive that information?
22 A. At this point I don't remember if I remember
23 hearing that part of the -- of the radio transmission.
24 Because at the time, I was on my bike, and they were
25 advising of the call; and they were asking or requesting

1  for units at the time, and there wasn't any available.
2  So when they started requesting for units, that's
3  when -- I believe at 9:51:24 is when I final -- I heard
4  them requesting units, so I piped up and advised I'd be
5  en route.
6  Q. Is that where -- you say 9:51:24. That's BK24?
7  A. That was my call sign at the time.
8  Q. That was your what?
9  A. That was my call sign at the time.
10 Q. Okay. Call sign, meaning that's when you're --
11 when someone calls you on the radio and says, BK24, are
12 you there, you know that they're calling you?
13 A. Yes, sir.
14 Q. Okay. And so you picked up. And do you know
15 when you said there? Did you just recognize the call or
16 what?
17 A. I advised that I'd be in en route, but -- it
18 isn't stated in here, but I advised I'd be en route, and
19 I was on my bicycle. It took me a minute to get to my
20 vehicle.
21 Q. And then you got to your vehicle?
22 A. Yes.
23 Q. And then the next entry that I can see that
24 means anything -- that means anything to me -- but maybe
25 you can help me -- is back down to 9:58:47. And it says

## Page 10

1  "Comment." Correct?
2  A. 9:58:47? Yes.
3  Q. Now, I've read through this, and I don't
4  understand the codes, and maybe you can help me
5  understand this.
6  A. Okay.
7  Q. At one point this call starts out as a -- if
8  you look at page 1, the 9:48:12 --
9  A. Uh-huh.
10  Q. -- and it goes "Priority 2, dot, dot, dot,
11  less than sign 1." What does that mean to you?
12  A. It was changed from a priority two to a
13  priority one, meaning that there was an incident that
14  didn't meet -- there was an immediate emergency. And
15  from the comments on the call, dispatch decided to
16  change it to priority one because things were
17  escalating.
18  Q. Now, you weren't -- when you get engaged --
19  like you said, you don't get engaged until 9:51:24.
20  A. Yes.
21  Q. At that point in time, what did you understand
22  the priority to be?
23  A. At that point it was priority one. And that's
24  the reason why -- they're requesting officers to clear
25  for the call. Being it's a priority one, they don't let

## Page 11

1  it hold at all.
2  Q. Okay. So what information did you have?
3  A. At that point all I knew is that it was a
4  priority one, and they needed officers to clear. I
5  didn't find out about the details of the call until I
6  got to my unit and was able to read what was on 9:33 and
7  9:47.
8  Q. Okay. So you get to your car, and then you're
9  able to read on the screen of your vehicle -- is that
10  what it is?
11  A. Yes.
12  Q. -- as to what you're approaching?
13  A. Yes.
14  Q. And I would assume that's the standard
15  procedure, to get to your car, and before you head out
16  to the site, you want some information?
17  A. Yes.
18  Q. And the information that I see, if you look at
19  9:34:48, is a description of the individual throwing
20  items inside the house. Says "Inside 20." 20 is like
21  when we used to play on CB radios and say, What's your
22  20?
23  A. That's location.
24  Q. That means location?
25  A. Yes, sir.

## Page 12

1  Q. Okay.
2  A. Where was that at?
3  Q. It's 9:38:48, "Entry." It says: "Mother/son
4  dispute - CLR." What is CLR?
5  A. Caller.
6  Q. "Caller advising male subject was in verbal
7  32." What's 32?
8  A. In a verbal fight, argument. 32 means fight.
9  Q. It says "verbal 32," right?
10  A. Yes.
11  Q. So a verbal fight?
12  A. (Indicating.)
13  Q. And he was throwing items inside the house,
14  inside the 20, inside the location?
15  A. Yes.
16  Q. And then they describe the suspect, right?
17  A. Yes, sir.
18  Q. It says: "Son is in bedroom of 20," of the
19  house or location, you say. "Poss on 58 [sic]." What
20  does that mean?
21  A. 57. Possibly on narcotics.
22  Q. Okay. 57 is narcotics. "Unknown what type."
23  "Negative 57 weapons." What does that
24  mean? I'm sorry. I didn't mean to say negative. "Neg
25  57 weapons." What does that mean?

## Page 13

1  A. It means negative drugs or weapons that the
2  caller's stating.
3  Q. So the caller's stating negative on drugs and
4  weapons?
5  A. Yes. But it did mention right before that that
6  he's possibly on drugs, but negative.
7  Q. Okay. And then "Clear requesting 34S."
8  A. Caller's requesting officers.
9  Q. Okay. Then we go down to 9:47:22. And if
10  there is any information I'm missing, that you say,
11  Well, this means something, please point it out to me.
12  A. Yes, sir.
13  Q. Because the only thing I can focus on, being
14  untrained, is on the bigger numbers and words. Okay?
15  A. Just to advise, that's the reason why I was a
16  party, too, because the information given was only
17  verbal at that point and things were escalating. That
18  was the reason I was a party, too, when it first came
19  out. But because of that information at 9:47:22, that's
20  when dispatch decided to change it to priority one.
21  Q. Okay. And actually if we look at 9:47:22,
22  that's a different caller than the call that was -- that
23  precedes that, right?
24  A. Yes, sir.
25  Q. And as I understand that call, with the numbers

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE NM 87102

1  and stuff as you have indicated, that caller is saying
2  that he's concerned because this suspect, Jerry, is
3  outside pacing back and forth with a Bible in his hand,
4  asking for forgiveness on what he's done.
5      A.  Uh-huh.
6      Q.  And that caller requests a welfare check,
7  right?
8      A.  Yes, sir.
9      Q.  Again, nothing said about guns, weapons of any
10 kind, right?
11     A.  Yes, sir.  No, sir.  But right above that,
12 there is a -- on 9:35:44, it's target hazard.
13     Q.  Yeah.
14     A.  And use caution.  48 is caution.
15     Q.  Okay.
16     A.  I don't know the exact details what the caution
17 was, but usually whenever there is a specific house
18 where there's an added risk of danger, they have a
19 hazard on a specific house, and this house was one of
20 those homes that had a hazard.
21     Q.  But it didn't say particularly what?
22     A.  I believe it did.  I just can't remember.
23     Q.  Okay.  And then -- so you pick up the call.
24 You get this information, and you get over to the house.
25     A.  Yes, sir.  Can I --

1      Q.  Go ahead.
2      A.  On the hazard, right at the end of 47:22 --
3  9:47:22, it says: "Use 48.  See hazard for listed
4  location."
5      Q.  Yeah.
6      A.  On that, I believe that there was another one
7  of these sent to my KTD, my computer, with the hazard
8  that had the details with Jerry Perea.
9      Q.  So you think that this is an incomplete CAD?
10     A.  This is not.  It's going to be -- it's
11 available through our dispatch to be able to pull the
12 hazard for that location, and it's sent to us.  So this
13 is our CAD, and then a separate message would be sent to
14 us with the hazard of that location.
15         MR. JUAREZ:  Well, I know we're at the end
16 of discovery, Counsel, so I don't know if we can request
17 that.
18         MS. GRIFFIN:  I'll get you a copy if it
19 still exists.
20         MR. JUAREZ:  If it still exists.  Thank
21 you, Counsel.
22     Q.  (BY MR. JUAREZ)  Now, putting this aside, let's
23 go to the house.  You get to the house?
24     A.  Uh-huh.
25     Q.  When you get to the location, what other

1  officers are on scene?
2      A.  It's Officer Dave Baca, who was the acting
3  sergeant at that time.
4      Q.  Uh-huh.  And when you arrive on scene, where is
5  he at?
6      A.  We -- I believe we arrived together.  And he
7  waited for me to get there, and then we walked and
8  approached the house at the same time.
9      Q.  Okay.  And when you get to the house, this is
10 the house -- is this the house that caller number two
11 called from or caller number one called from?
12     A.  I believe caller number one.
13     Q.  Okay.  The woman?
14     A.  Yes, ma'am -- I mean sir.
15     Q.  When you get there, you go knock on the door,
16 or does somebody come out before you get there?
17     A.  As we were approaching, an elderly male and
18 female walked out of the residence.
19     Q.  At that point in time, do you have your
20 emergency equipment engaged?
21     A.  No.  As a matter of fact, we parked a little
22 down to make a safe approach.
23     Q.  Okay.  And when you get there -- on your way to
24 approaching the house, did you notice any individuals,
25 any people running, anything from the house?

1      A.  No, sir.
2      Q.  I take it that you were focused on the house?
3      A.  Yes, sir.
4      Q.  And an elderly couple comes out?
5      A.  Yes, sir.
6      Q.  And who engages them in conversation, you or
7  Officer Baca?
8      A.  I believe I did.
9      Q.  And tell me the nature of that conversation.
10     A.  It was a real short conversation.  It was them
11 advising me that the suspect in question had left the
12 residence on a bicycle and that he was possibly on
13 drugs, and they were afraid for his welfare, advising
14 that he was acting -- acting up.
15     Q.  Acting erratic?
16     A.  Yes.
17     Q.  Did you -- since this was -- it changed from a
18 priority one -- I mean from a priority two to a priority
19 one based on the second call as a welfare check,
20 correct?
21     A.  Yes, sir.
22     Q.  And that was the caller's concern that the
23 individuals, the elderly couple living in the house,
24 might need some assistance?
25     A.  Yes.

Page 22

1  A. No, sir.
2  Q. To this point he hadn't hurt anybody?
3  A. No, sir.
4  Q. Hadn't hurt himself?
5  A. No.
6  Q. Didn't have a weapon?
7  A. No.
8  Q. The only thing they told you that he had was a
9  Bible?
10  A. I believe so. Well, on the call it stated
11  that. I'm not sure --
12  Q. If the parents told you that?
13  A. Yeah.
14  Q. Okay. And so when you leave to go detain
15  him --
16  A. Uh-huh.
17  Q. You leave the site with the intent of detaining
18  this individual?
19  A. Yes, sir.
20  Q. How do you locate him?
21  A. I was given a direction of travel by the
22  family, by the male and female, and at that point, I
23  just started going in the same direction. And I was
24  able to find a male subject on a bicycle.
25  Q. I know this is not to scale, but what I'd like

Page 23

1  you to do is draw a general schematic as you can best
2  recall of the area in which you first see what you
3  perceive to be the suspect individual.
4  A. I don't believe it would be accurate being that
5  I haven't been in this area for a while, and it's not
6  fresh in my memory of the actual --
7  Q. Okay. Do you recall what direction or what
8  street you were on?
9  A. From the CAD, it states, "Subject left on bike
10  towards the south of the location," and that's the
11  direction I started looking for this individual. I do
12  believe that I was on 4th Street -- I mean on 2nd
13  Street. I did see him going down -- it's not San
14  Lorenzo. It's that street just north. It might be San
15  Lorenzo that he was on, but I can't remember. I
16  believe, actually, it was San Lorenzo. He was headed
17  west, and at that point, I advised that I had eyes on
18  the individual. And as I was approaching him in my
19  marked police car, he did look back and notice I was in
20  my police car, and he began to pedal a lot faster.
21  Q. Okay. Now, when did you engage your emergency
22  equipment?
23  A. Once he looked back and noticed that -- he saw
24  me, and he began -- his actions were that he was trying
25  to elude me.

Page 24

1  Q. Well, if you saw a police vehicle -- you didn't
2  have your emergency equipment on, so you don't know --
3  he didn't know you were after him, did he? I mean, that
4  would be a supposition on your part, right?
5  A. Well, his actions showed that --
6  Q. He just started pedalling faster?
7  A. Well, the fact that he looked back at me and
8  made eye contact and then began to take off at a higher
9  speed, at that point I did turn on my lights and sirens
10  to get his attention. He looked back again, saw that I
11  was looking directly at him trying to stop his actions.
12  He then -- instead of stopping, he went straight through
13  to 4th Street, which is a busy street, and caused a few
14  vehicles to slam their brakes, which, you know, he would
15  have got hit if they didn't.
16       He continued through the intersection, and
17  at that point I was able to get ahead of him and place
18  my vehicle in front of him. That made him make a
19  right-hand turn into a parking area of a transmission
20  shop right at 4th and San Lorenzo, and that's when I
21  exited my vehicle.
22  Q. So he's right in front of you, and you say he
23  looks back and sees you?
24  A. Uh-huh.
25  Q. There is no other traffic in front of you?

Page 25

1  A. No.
2  Q. No other vehicles? Nothing?
3  A. Well, behind me or in front of me on that
4  street, no. There were just parked vehicles. The
5  actual -- on 4th Street, there was a lot of traffic
6  going north to south.
7  Q. Is that controlled by a traffic light?
8  A. No.
9  Q. It's just a stop sign?
10  A. Yes, sir.
11  Q. And he went -- he goes through that street and
12  then turns?
13  A. Because I was able to cut him off, he did turn
14  into the transmission shop.
15  Q. So he's going straight, and you're behind him?
16  A. Yes.
17  Q. And he's pedalling fast?
18  A. Yes.
19  Q. And then you get in front of him and cut him
20  off into the transmission shop?
21  A. Yes.
22  Q. He doesn't turn off into side streets or
23  anything like that?
24  A. No.
25  Q. And so you sort of guide him in, cut him off

1  when you went to go look for him along with Officer
2  Baca?
3  A. Yes.
4  Q. When you did see him, what did you notice him
5  doing on the street?
6  A. I noticed him endangering himself and the
7  people that were driving on 4th Street. The fact that
8  he went through the intersection and almost got hit by a
9  vehicle, he was showing a disregard for himself and the
10 other drivers.
11 Q. So when you went to go detain him, was that a
12 concern of yours, that he was about to harm himself by
13 riding his bike through traffic the way he was?
14 A. Yes.
15 Q. As well as coupled with the information you got
16 from the parents?
17 A. Yes.
18 Q. Now, you were asked a question by Mr. Juarez
19 about if you had any information if he hit anybody. Did
20 it seem to you -- and you had answered no. Did it seem
21 to you from the nature -- from the information relayed
22 in the call that he could have been threatening --
23 A. Yes.
24 Q. -- in his behavior.
25      And what information in the call would

1  indicate threatening behavior?
2  A. In the actual CAD, it stated that he was
3  threatening the mother, and it was a verbal dispute
4  between them.
5  Q. Well, it said that he was throwing -- the
6  caller said he was throwing items inside 20, meaning the
7  location?
8  A. Yes.
9  Q. And are you aware as to whether or not a threat
10 can be based upon threatening or menacing conduct?
11 A. Yes.
12      MR. JUAREZ: Objection. Calls for a legal
13 conclusion.
14 Q. (BY MS. GRIFFIN) And so the information on this
15 9:34:48 entry in the CAD, would that indicate to you
16 there is a possible assault that occurred?
17 A. Yes.
18 Q. Now, I want to ask you about the Taser -- and I
19 think I only have -- we'll mark this as 4 to your
20 deposition. I'll let you have my copy.
21      MR. JUAREZ: I think you provided this in
22 the --
23      MS. GRIFFIN: Yes, sir.
24      MR. JUAREZ: -- in the professional --
25      MS. GRIFFIN: In the initial disclosures

1  and --
2      MR. JUAREZ: I think so, yes.
3  Q. (BY MS. GRIFFIN) Do you recognize what Exhibit
4  4 is?
5  A. Yes.
6  Q. What is it, to your knowledge?
7  A. It's a history of every single time my Taser
8  was activated.
9      (Exhibit Number 4 marked.)
10 Q. Okay. What I want you to do is turn to page 3
11 of this document on Exhibit 4, and there appears to be,
12 on page 3 -- and it starts with a number in the far left
13 corner, 0063, and then there is a date, 3/21/2011. Do
14 you see that? Is that correct?
15 A. Yes.
16 Q. And then there are a series of numbers
17 handwritten by the date, 3/21/2011. Do you see that
18 area?
19 A. Yes, I do.
20 Q. So when you said that you had information that
21 you believe Mr. Perea was tased ten times, is this the
22 source of the information?
23 A. It is.
24 Q. And did you have this information at the time
25 that you were interviewed?

1  A. For the criminal?
2  Q. Yeah.
3  A. No.
4  Q. So when you're saying he was tased ten times,
5  is it based upon -- what do you base that on, I should
6  ask?
7  A. The information I'm seeing here, it has the
8  date and the time stamp of when it was engaged, and it
9  shows on that date that it was used ten different times.
10 Q. Okay. Do you have a specific recollection if
11 Mr. Perea actually was tased ten times?
12 A. Say again.
13 Q. Sitting here today, do you have a specific
14 recollection of tasing Mr. Perea ten times?
15 A. Yes.
16 Q. You do?
17 A. (Indicating.)
18 Q. Yes?
19 A. Yes.
20 Q. Now, the first time, that's when you attempted
21 to use it in the prong mode, correct?
22 A. Yes.
23 Q. And that would have been indicated by the 0063
24 application --
25 A. Yes.

## Page 26

1   into the transmission shop?
2   A. Yes, sir.
3   Q. And explain that area to me, the, quote,
4   unquote "transmission shop area."
5   A. It's a gated property, and then you have a
6   transmission shop. There is a covered porch, and he
7   just -- there was an open gate, and he went into the
8   transmission shop.
9   Q. The whole thing is chain-linked off?
10  A. Yes, sir.
11  Q. Now, is there, to the best of your knowledge, a
12  unit there that deals with people who are having
13  psychological problems?
14  A. Yes, we do have one. It's the Crisis
15  Intervention Team.
16  Q. Now, you said on the CAD, there was more
17  information on Mr. Perea.
18  A. Uh-huh.
19  Q. Was part of that information that he had mental
20  problems?
21  A. I believe so, yes.
22  Q. At that point did you seek to contact the
23  Crisis Intervention Team?
24  A. No, being the fact that things were escalating.
25  And I do have -- at that point I did have some training

## Page 27

1   with the Crisis Intervention. It was through the
2   academy where we did training on that.
3   Q. But there is a Crisis Intervention Team?
4   A. Yes, sir. And it takes -- usually takes quite
5   a long time to get them en route. There is officers in
6   the field that are CIT certified, but at that point I
7   was the only one available to answer this call, much
8   less to get a CIT officer en route. Everyone was -- at
9   that point everyone was either on a call or busy with
10  something else. That's the reason I cleared to take
11  this call.
12  Q. Did you indicate to anybody -- did you call
13  anybody to tell them you might need a CIT, a Crisis
14  Intervention Team?
15  A. No, I did not.
16  Q. The immediate crisis or the immediate incident
17  that had brought you and Officer Baca to the scene had
18  somewhat been dissipated by the individual leaving the
19  location, correct?
20      MS. GRIFFIN: Object to form, foundation.
21  A. Yes, sir.
22  Q. (BY MR. JUAREZ) Okay? Is that correct? You
23  can answer the question. Note her objection.
24  A. Yes, sir.
25  Q. And at that point, as I understand the nature

## Page 28

1   of your going to detain this individual, is that you
2   were concerned about him being possibly intoxicated?
3       MS. GRIFFIN: Object to form --
4   A. No, sir.
5       MS. GRIFFIN: -- and foundation.
6   A. The fact that I was looking for him was that he
7   might be a danger to himself or others, being his
8   behavior from the mother and the father.
9   Q. (BY MR. JUAREZ) Okay. What information did you
10  have at that point that you believed made him a danger
11  to himself or to others?
12  A. The fact that people that did know him believed
13  that his behavior was erratic, and he was going to be a
14  danger to himself.
15  Q. And you didn't call in to request the Crisis
16  Intervention Team at that point?
17  A. No, sir, I didn't. I believe that Dave --
18  Officer Dave Baca, at that point, was a crisis
19  intervention officer. He was on scene, and he was with
20  me during this incident.
21  Q. And so you go looking for him. You see him on
22  the street. You engage your emergency vehicle -- your
23  emergency equipment?
24  A. Uh-huh.
25  Q. And you corral him into this transmission area?

## Page 29

1   A. Yes, sir.
2   Q. As best as you can tell, how many exit and
3   entrance gates were in that particular area?
4   A. I believe two.
5   Q. And they were where?
6   A. Where he entered, which was off of San Lorenzo,
7   and I believe there was one off of 4th. I'm not 100
8   percent sure.
9   Q. Okay. So you corral him into the transmission
10  shop, and then what happens?
11      MS. GRIFFIN: Object to form.
12  A. ==What happened was I positioned my vehicle, and
13  I caused him to go into the transmission shop. I exited
14  my vehicle and began to chase after the individual,
15  advising him that I was a police officer. As I was
16  chasing after him, it looked, at first, like he was==
17  going to throw a U-turn and go the opposite way, which I
18  ==blocked him, but I believe that's when Officer Dave
19  Baca's vehicle blocked him in and made him go into the
20  transmission shop.==
21      ==I ran towards him until he slowed down next
22  to the fence, and that's where I was able to go hands-on
23  with him near the fence.==
24  Q. (BY MR. JUAREZ) Okay. Explain to me how the
25  bike was near the fence.

8 (Pages 26 to 29)

1  A. He was on the bike, and he was close to the
2  fence.
3  Q. Had he stopped pedalling at that point?
4  A. He was -- he was still pedalling.
5  Q. And then what happens when he gets close to the
6  fence?
7  A. I pushed him in towards the fence and -- which
8  caused him to stop. And I hit my knee on his bicycle.
9  We began to -- I began to try to grab his hands in order
10 to stop his hands from -- from striking.
11         During this process, I do remember looking
12 at his face and at first seeing that he was -- you know,
13 it was almost like he was lost, and then it turned into
14 anger. When it turned into anger, he did make a motion.
15 He pulled back his arm. And at the time, I'm not sure
16 what was in his hand, but he had something in his hand.
17 And he lunged towards me in a punching motion and hit me
18 in my chest. And I wasn't sure if he had a knife in his
19 hand or what he had in his hand. So I looked down to
20 make sure that I was okay while I'm still trying to
21 actively grab his hands and saw that nothing was cut on
22 my shirt. I looked back up, and I noticed that it was a
23 crucifix in his hands.
24 Q. So let me see if I get the sequence of events
25 correct, and tell me if I do. So you cut him off in the

1  transmission shop. He seems like he's still going to
2  try to get around you, go back out. Officer Baca drives
3  up in his unit and cuts him off from that particular
4  exit or whatever?
5  A. Yes, sir --
6      MS. GRIFFIN: Object to the form.
7  A. -- to go back onto 4th Street.
8  Q. (BY MR. JUAREZ) You are giving, sort of,
9  pursuit at that time on foot?
10 A. Yes, sir.
11 Q. You get close enough to him that you -- how do
12 you put hands on him when you get close to him?
13 A. When he's on the bike, I just pushed him into
14 the fence.
15 Q. You just shoved him into the fence?
16 A. Yes, sir.
17 Q. And he hit the fence?
18 A. Yes, sir.
19 Q. Okay. And then you went at him and grabbed
20 him?
21 A. Yes, sir.
22 Q. And then he hit you?
23 A. Yes, sir.
24 Q. What is said prior to you putting hands on him?
25 A. I don't believe anything was said. I was in

1  the process of running. But I was in my marked patrol
2  car and in full uniform.
3  Q. Full uniform.
4  A. Correct.
5  Q. And so you hit him against the fence. And
6  after you hit him against the fence, you try to grab
7  him, and then he strikes you back?
8      MS. GRIFFIN: Object to form.
9  Q. (BY MR. JUAREZ) Is that correct?
10 A. I push him into the fence.
11 Q. You said you went to grab his hands.
12 A. Went to grab his hands. I get struck. That's
13 when Officer Baca arrived. We were advising him that
14 we're here to help him, and that's when --
15 Q. Let's get into the struggle. I mean, you're
16 already -- at the point that you say anything to him,
17 you're already involved in a struggle, correct?
18 A. Yes, sir.
19 Q. And so you're struggling with him. You and
20 Officer Baca are struggling with him, and at that point
21 you say, Hey, calm down; we're trying to help you?
22 A. Yes, sir.
23 Q. How long between the time that you first put
24 hands on him and pushed him, you know, up against the
25 fence to the first time you taser him; do you know?

1  A. I don't know. I know it didn't happen
2  instantly. It was a struggle for quite some time before
3  it was actually used.
4  Q. Okay. So then you taser -- at some point you
5  taser him, correct?
6  A. Yes, sir.
7  Q. You both -- and how is that achieved; do you
8  recall?
9  A. We're in the middle of trying to get control of
10 him. It wasn't working. Officer Dave Baca advised me
11 to use my Taser. So at that point, I grabbed my Taser,
12 and I shoot the prongs towards -- in his direction,
13 which it appeared that it hit him. While the Taser was
14 cycling, I did remember seeing him reach towards the
15 string that was attached to the prongs and yank
16 (indicating). And at that point, the Taser wasn't being
17 effective.
18 Q. I'm going to hand you what we're going to mark
19 now as Defendants' Exhibit Number 3 -- I mean
20 Plaintiffs' Exhibit Number 3. Now, I'd like you to look
21 at that and see if you recognize that.
22 A. Yes, sir, I do.
23     (Exhibit Number 3 marked.)
24 Q. It appears to be a transcription of a statement
25 you gave; is that correct, Officer Jaramillo?

1  A. Yes, sir.
2  Q. And that was on or about the same date of the
3  incident, correct?
4  A. Yes, sir.
5  Q. And did you have an opportunity to review this?
6  A. Yes, sir.
7  Q. Is this part of what you reviewed prior to you
8  coming here today?
9  A. Yes, it was.
10 Q. Would you tell me if that document in front of
11 you appears to be a complete and accurate document of
12 the interview that you had?
13 A. Yes, sir.
14 Q. And if you would look at page 9 of that
15 document, looking at line 12 --
16 A. Uh-huh.
17 Q. -- would you read that? And does that sort of
18 accurately reflect what happened in terms of the tasing?
19 A. Yes, sir.
20 Q. So when you use the contact Taser -- that's the
21 one that has the little wires coming out of it, right?
22 A. That's the probe. The contact is --
23 Q. I mean the stand-off --
24 A. Yes.
25 Q. -- the stand-off Taser, that's the one that you

1  used?
2  A. Yes, sir. It's the same Taser.
3  Q. And when you hit him with it, he was facing
4  you?
5      MS. GRIFFIN: Object to form.
6  Q. (BY MR. JUAREZ) Do you recall?
7  A. I don't remember. The whole time it seemed
8  like me and him were face to face.
9  Q. Okay. Because a second ago you indicated with
10 your hands grabbing the front of your chest to pull off
11 the Taser; you said it seemed like he was trying to pull
12 off the wires.
13 A. Yes, sir.
14 Q. Is that what you recall?
15 A. I just remember that motion towards the
16 direction of where the -- where the -- so when you fire
17 the Taser, the wires stay connected to my Taser, and
18 wherever they hit, they're on his person. But it looked
19 like he made a motion where -- closer to where I was,
20 with the wires coming off the Taser, to grab hold and
21 yank.
22 Q. So to the best of your recollection, he was
23 facing you?
24 A. I believe so. Yes, sir.
25 Q. And then in your mind, he's not responding to

1  being tased?
2  A. Yes, sir.
3  Q. You say he sort of balled up his fists and
4  leaned back?
5  A. Usually the way I've seen a Taser work, it
6  completely stops someone's actions. It doesn't allow
7  them to move or struggle or fight anymore, until that
8  five-second cycle is done.
9  ==In his case, I shot the Taser towards his==
10 ==direction, and he was still able to even reach and grab==
11 ==the -- the -- the -- the string that's attached to the==
12 ==prongs and continue to resist myself and Dave Baca.==
13 Q. What did you do next?
14 A. At that point I believe there was some time
15 that lapsed in between, and I started doing the contact
16 tase.
17 Q. What do you mean you started doing the contact
18 tase?
19 A. Where the Taser -- the front of the Taser -- so
20 the prongs are shot out, but there are still two metal
21 connections on the front of the -- the doors, and if
22 those touch an individual, it should -- it should stop
23 their action.
24 Q. Now, prior to you leaving the station house and
25 you get your Taser, do you make sure it's operative?

1  A. Yes, sir.
2  Q. To the best of your knowledge on that day, was
3  it operative?
4  A. I believe so. Yes, sir.
5  Q. So you fired the stand-off Taser. I'll call it
6  a stand-off Taser. How long did you wait before you
7  moved towards him with the contact Taser -- Taser, I
8  mean?
9  A. I don't know the exact time. I just knew it
10 wasn't working. I've done and I've seen the Taser work
11 where it completely stops someone and their actions.
12 This time it didn't. So we continued to struggle and
13 try to get him in our custody.
14 Q. Okay. When you say it didn't work, is that
15 what you said when he makes the motion to try to get the
16 wires off?
17 A. The fact he's able to continue to resist is
18 when I say it didn't work.
19 Q. Now, when you say continues to resist, he's
20 standing in front of you, you shoot the stand-off Taser.
21 It hits him somewhere in the body. You say you don't
22 know where.
23 A. Huh-uh.
24 Q. But you see him make a motion as if he's going
25 to try to get the wires off. Okay? Is that what you're

1  A. No.
2  Q. Do you recall, when you contacted Mr. Perea as
3  a suspect in this case, what he was wearing?
4  A. I believe he was wearing all black.
5  Q. Was he wearing a heavy leather coat?
6  A. No, not that I remember.
7  Q. He was just wearing a regular shirt?
8  A. I believe so.
9  Q. And you indicate on line 18 of your statement,
10 "I've tased someone before"?
11 A. Yes, sir.
12 Q. Okay.
13    MS. GRIFFIN: Line 18, page what?
14    MR. JUAREZ: Line 18, page 9. I'm sorry.
15    MS. GRIFFIN: Thank you.
16 A. Yes, sir.
17 Q. (BY MR. JUAREZ) And you indicate that that
18 person that you tased -- and I don't know if it was just
19 one person or several persons, but those persons or
20 person reacted differently than Mr. Perea?
21 A. Yes, sir.
22 Q. So you're standing there. You release your
23 contact -- I mean the stand-up Taser. To the best of
24 your knowledge, does it appear to hit Mr. Perea?
25    MS. GRIFFIN: Object to form, foundation.

1  A. I'm not sure. I just know it was in his
2  direction.
3  Q. (BY MR. JUAREZ) But you did see him make a
4  motion to try to get wires?
5  A. Yes, sir.
6  Q. Okay. Between the time of the motion of the
7  hand trying to reach at wires, how much time would you
8  think passed between that and the first contact tase
9  that you gave him?
10 A. I'm not sure. But I do believe I have the
11 documents on that.
12 Q. You have the cycling documents on the -- I
13 think you provided those to counsel --
14 A. Yes, sir.
15 Q. -- is that correct?
16    And you would believe those would be
17 correct?
18 A. Yes, sir.
19 Q. And so Perea gets hit somewhere or doesn't get
20 hit. You then do a contact -- you approach him and do a
21 contact tase?
22 A. Yes, sir.
23 Q. And I take it at that point the scuffle is
24 going on?
25 A. Yes, sir.

1  Q. At that point is he -- I would assume he's off
2  the bike; is that right?
3  A. The bike's in between us in the struggle, and
4  it's --
5  Q. It's just like there, like dropped on the
6  ground; is that correct?
7  A. Yes, sir. I think we ended up moving a little
8  further north to get away from the bike, but it was
9  along the fence. He was using the fence, like staying
10 up along the fence.
11 Q. Now, the struggle continues, correct?
12 A. Yes, sir.
13 Q. Tell me more about the struggle. So you have
14 this stand-up tasing. Then you have a contact tase.
15 What happens next?
16 A. Well, once I saw that the Taser, at first,
17 wasn't effective when I used the prongs, I didn't have
18 enough time to holster my Taser, being that it's a
19 cross-draw. So at that time, I did not want to let go
20 of the Taser being that it could be a weapon for him,
21 and I decided to use it again as a contact, as a pain
22 compliance on Mr. Perea. I used it, and we began to go
23 towards -- more towards the ground.
24    I waited some time. I was attempting to
25 get his arms again. I used it again. At that point --

1  somewhere along -- during this whole struggle, he
2  began -- I seen the motion of him, which he still had
3  the crucifix in his hand, hitting Officer Baca. I used
4  the Taser again. We were able to get him on his
5  stomach, and we were still trying to fight for his arms.
6  He's continuing actively to resist throughout this whole
7  process. I used it again.
8     And I was able to start pulling back one of
9  his arms. Every time I'd start getting a little bit
10 more, a little bit more, every time I used the pain
11 compliance on him, up until the point we were able to
12 get him in handcuffs.
13 Q. Do you know how many times you tasered him
14 before you got him into handcuffs?
15 A. At the time I didn't know how many times. I
16 believe it was ten times, reference the stuff I reviewed
17 yesterday.
18 Q. And you actually tasered him after he was
19 handcuffed, correct?
20 A. No, sir. Once he was handcuffed, there was no
21 more Taser being used.
22 Q. So you don't think you tasered him after he was
23 handcuffed?
24 A. I don't believe so. The Taser was used to get
25 him into custody, and once we did, I was able to holster

## Page 46

```
 1   up the taser, as well as get the other stuff off the
 2   floor that was --
 3       Q.  I'd like you to --
 4       A.  -- during the struggle.
 5       Q.  I'd like you look at page 11 of your statement,
 6   and reading from line 12, tell me if that's accurate or
 7   not.
 8       A.  (Witness complies.)
 9           I was able to get one handcuff on him.  He
10   wasn't in full custody yet.  He was never tased after he
11   was in our custody.  One of the -- one of the handcuffs
12   was on his arms.  As -- as he was -- I was reaching to
13   put the other one on his other arm, his arm was pulled
14   back underneath, and then -- so no, he wasn't tased
15   after he was handcuffed.
16       Q.  So you figure you tasered him about ten times.
17   And after you get the handcuffs on him, what happens?
18       A.  Like I said, I holstered up the Taser.  My
19   radio was underneath him.  I was trying to get it out
20   from underneath him, so we could let the other officers
21   know that we were okay.  I get my radio, realized it was
22   broken.
23           I start, you know, trying to fix myself and
24   catch my breath.  I was exhausted.  I just remember
25   being exhausted being that I had rode a few blocks.  I
```

## Page 47

```
 1   think it was about six blocks to get to my vehicle, and
 2   then to chase after him and get in a struggle, I was
 3   pretty tired.  So I just remember trying to catch my
 4   breath.  I had my hands on my knees at several points
 5   just trying to catch my breath.
 6           Then Mr. Perea was handcuffed on the floor,
 7   on his stomach, and I believe Officer Baca told me that
 8   he stopped breathing.  We immediately rolled him over.
 9   I went to his head to clear his airway while Officer
10   Baca was doing chest compressions.  We did that until he
11   came back, conscious.
12       Q.  During the times that you were tasing him, how
13   long were you holding contact on his body; do you
14   recall?
15       A.  I believe they were five-second cycles.  I'm
16   not sure exactly how long.
17       Q.  And how often between cycles; do you recall?
18       A.  I only used it when I needed it, when I felt --
19   you know, there were points when I started getting
20   control of his arm and I was pulling it back, but then
21   he started gaining a little more on me, so then I'd use
22   it again.  And then I'd get a little more, so on, until
23   I was able to finally get his arm all the way behind him
24   and put that one cuff on, and then the other one came.
25   I mean, Officer -- Officer Baca was able to put the cuff
```

## Page 48

```
 1   on and then the other.
 2       Q.  Where were you tasing him at on his body; do
 3   you recall?
 4       A.  In his back area.
 5       Q.  Upper back?  Lower back?
 6       A.  I'm not exactly sure.  It was several areas
 7   being that it was constant resistance from him.
 8       Q.  So with the contact Taser that you used, how
 9   many times did you hit him in the upper front torso of
10   his body?
11       A.  I don't know.  I don't know if I did.
12       Q.  You think it was mostly in the back when you
13   were trying to get his arm behind him?
14       A.  Yes, sir.  The way he fell, he was facing
15   Officer Baca, and I was to the right of him.  When he
16   fell -- when he started going down and I started using
17   the contact Taser, we pushed him, and he was able -- he
18   landed on his side, and we were able to push him to his
19   stomach.
20       Q.  And when you had him on his stomach, how soon
21   after you had the handcuffs on him did you notice he had
22   stopped breathing?
23       A.  He was groaning for a while.  He was, like,
24   screaming and -- (demonstrating).  And I remember
25   looking at his hands, because -- I was up against the
```

## Page 49

```
 1   fence and I had my hands on my knees, and I was trying
 2   to catch my breath, and I remember looking at his hands.
 3   And he was trying to pull the handcuffs apart.  And it
 4   didn't -- it didn't appear that he felt any pain because
 5   he was doing it with a motion where you could see that
 6   it was cutting into his skin, pulling, pulling
 7   (demonstrating).
 8       Q.  And this was when the cuffs were behind his
 9   back?
10       A.  Yes.
11       Q.  You could actually see him struggling with
12   them?
13       A.  Yeah.  You could see, like, his whole body
14   stiffen up, and he was just trying to yank.  And he's
15   trying with all of his might and power to -- to pull
16   these cuffs off.  And like I say, I'm trying to catch my
17   breath, and he continues to make these noises.  And all
18   of a sudden, he stops making the noises.  Officer Baca
19   went to check on him, and that's when he told me that he
20   stopped breathing.  We rolled him over to his back right
21   away, and that's when we began to administer CPR.
22       Q.  You say he was making noises?
23       A.  The noises he was making was -- he was trying
24   to break the handcuffs.  He was -- every time he would
25   tighten up his body to yank the cuffs, it was like --
```

13 (Pages 46 to 49)

## Page 50

1 (demonstrating). It was like, you know, if someone's
2 working out and they're about to lift up that heavy
3 weight, that's the noise he was making every time he was
4 trying to yank the handcuffs off.
5    Q. He was struggling with something?
6    A. No. He was trying to break the handcuffs. It
7 wasn't that he was struggling. He was -- his body would
8 straighten up, and he was trying to pull the handcuffs
9 apart.
10    Q. His body would straighten up? What do you mean
11 by that?
12    A. He would stiffen up (demonstrating).
13    Q. He would stiffen up?
14    A. Yeah. And you could see -- you could see,
15 every time that he would make the noise, that his hands
16 would turn white. He was yanking so hard that it was
17 cutting the circulation off from his hands.
18    Q. And then shortly after that, Officer Jaramillo
19 noticed he stopped breathing?
20    A. Officer Baca.
21    Q. I mean Officer Baca noticed he stopped
22 breathing?
23    A. Well, he stopped making noises. At that point
24 Officer Baca went to -- you know, I can't say what he
25 went to do or why he went over there, but I noticed that

## Page 51

1 he stopped -- he stopped --
2    Q. Making the noise.
3    A. -- making the noise. I was still trying to
4 catch my breath; I didn't think nothing of it. And
5 Officer Baca went right up to him and noticed that he
6 wasn't responding. We thought maybe he had just lost
7 consciousness. We rolled him over, and Officer Baca
8 noticed that he wasn't breathing.
9        At that point he starts doing chest
10 compressions. I went up to where his head was and I
11 straightened out his -- his airway, made sure it was
12 clear of anything, and we began doing CPR, until he
13 regained consciousness and began breathing on his own
14 again.
15    Q. Okay. And what happened -- what happened when
16 he started to breathe on his own again?
17    A. It appeared that he didn't know where he was.
18 I believe he said something to the effect that -- he
19 apologized for, you know, what was going on, and he was
20 actually calm for a little bit.
21        ==Once the paramedics came, we advised them
22 of what happened, that he stopped breathing. I mean not
23 the paramedics but the firefighters. They got there.
24 And then when they got there -- I don't know if -- I
25 don't know if the sirens triggered him again, but when==

## Page 52

1 ==they were en route, the sirens were going on off. And
2 that's when he started to build up some energy again,
3 and he started hitting his head and screaming and doing
4 the same things he was doing prior to him stopping
5 breathing.==
6    Q. You say when he first started breathing again,
7 he seemed disoriented?
8    A. At first, yes. He seemed like, you know, he
9 was -- we had notified rescue that they needed to step
10 on it because -- because he was -- because, you know, we
11 were having to do CPR and stuff like that on him.
12    Q. Okay. And then you said he started hitting his
13 head?
14    A. Yes, sir.
15    Q. What do you mean by that?
16    A. So he was on his back, and he started hitting
17 his head because he wasn't happy with being handcuffed.
18    Q. But he started hitting his head against the
19 cement?
20    A. Against the asphalt.
21    Q. Against the asphalt. He was laying -- at that
22 point he was laying on his back, facing up?
23    A. Yes.
24    Q. And he's starting -- he starts to hit his head
25 against the --

## Page 53

1    A. And starts to kick, so I jump on his legs.
2    Q. Okay. And starts to kick.
3        Does he say anything?
4    A. No. He just starts making weird noises again,
5 and then -- well, yeah, he did. He started saying, God,
6 forgive them; God, forgive them, and screaming stuff
7 like that.
8    Q. He started yelling, God, forgive them?
9    A. Or God, forgive me, one or the other, something
10 with forgiveness.
11    Q. What were the noises he was making?
12    A. He seemed -- he was like -- (demonstrating) --
13 like he was agitated and he wanted to fight.
14    Q. And so he was hitting his head, stiffening up,
15 kicking his legs?
16    A. ==So at that point, we decided to get a headrest
17 to make sure that he didn't hurt himself.==
18    Q. Okay. So you put a head restraint on him?
19    A. ==Yes, sir.==
20    Q. What kind of headgear -- what kind of headgear
21 did you put on him?
22    A. ==It's your typical boxing headgear.==
23    Q. Okay?
24    A. It's padded all the way around so that if, you
25 know, someone's hitting themselves, they don't injure

14 (Pages 50 to 53)

1 themselves.
2    Q. Okay.
3    A. While -- while we were trying to put this
4 headrest on him, you know, one of the firefighters was
5 holding Perea's head so he wouldn't continue to hurt
6 himself, while I was holding his legs, and he started
7 spitting. He spit on Officer Baca's arm. And I
8 remember looking at his arm, and you could see the blood
9 from the spit on his arm. And then he spit in the face
10 of one of the firefighters.
11    Q. So he's laying down, making weird sounds, and
12 then he starts saying, God, forgive me -- or God,
13 forgive them. He's hitting his head. Where did the
14 blood in his mouth come from?
15    A. I believe from the struggle of the incident.
16 I'm not sure exactly where the blood came from, but he
17 did have, I believe, some bleeding on his lip.
18    Q. And then he spit?
19    A. Yes.
20    Q. And when he spit, some of that spit hit Officer
21 Baca and the firefighters?
22    A. Yes, sir.
23        The whole time, our main goal was to make
24 sure that he didn't hurt himself, and, you know, from
25 the beginning to the end, we were trying to help him not

1 hurt himself. And in doing so, we were trying to
2 hold -- you know, the firefighter even helped us by --
3 because there weren't enough officers there, by holding
4 his head so he wouldn't continue to hurt himself. We
5 didn't want him to hurt himself.
6    Q. And at some point in time, did he stop
7 breathing again?
8    A. Yes.
9        We had rolled him over to his stomach
10 whenever he finished spitting on the firefighter and
11 Officer Baca. I ran to Officer Baca's vehicle to get
12 his spit sock to put over Mr. Perea so that he wouldn't
13 continue spitting on us. As we put the spit sock on him
14 and put the headrest back on him, they began to do
15 vitals on Mr. Perea.
16        While they were doing vitals on Mr. Perea,
17 believe they were getting his pulse through the finger,
18 or maybe they were getting blood from him. It was
19 something with his finger, I remember. They were
20 attempting to get some readings on him, and I noticed
21 that he stopped breathing. I believe I told one of them
22 that he might have stopped breathing again.
23        They rolled him back to his stomach,
24 realized that he had stopped breathing. We took off all
25 the headgear, took off the handcuffs, and they began to

1 administer CPR to him.
2    Q. Officer Jaramillo, prior to the police contact
3 with Mr. Perea on this day, had you received, on this
4 day, regarding this incident, any information that
5 Mr. Perea had hurt himself?
6    A. No.
7    Q. Had you received any information that he had
8 hurt anybody?
9    A. No. But his behavior --
10    Q. I appreciate that.
11    A. The information that I got from people that
12 knew this individual is the only information I had, and
13 I had to go based off of what they told me.
14    Q. Let me ask you again. You had no information
15 that he had hurt anybody that day, had you?
16    A. No.
17    Q. And as he was riding down the bicycle -- the
18 bicycle down the road after he left the house, you
19 received no calls from any civilians indicating that he
20 was doing anything wrong, correct?
21    A. No.
22    Q. So the only time Mr. Perea ever hurt himself
23 that day was in your presence after you detained him?
24    A. Yes, sir. From what I'm aware of, yes.
25        MR. JUAREZ: Okay. Let's take a quick

1 break. We might be at the end of this.
2        MS. GRIFFIN: I've got questions.
3        MR. JUAREZ: No, you don't.
4        MS. GRIFFIN: Yes, I do.
5        (Break taken, 10:46 a.m. to 10:52 a.m.)
6        MR. JUAREZ: You can go ahead, Counsel.
7        MS. GRIFFIN: Are you passing the witness?
8        MR. JUAREZ: Yeah.
9        MS. GRIFFIN: Did you get that on the
10 record?
11        (The court reporter responds.)
12        EXAMINATION
13 BY MS. GRIFFIN:
14    Q. I have a few follow-up questions for you,
15 Mr. Jaramillo.
16        First with respect to the call, when you
17 arrived at the residence, did it seem to you that the
18 parents -- or the male and the female that you spoke to,
19 they wanted Mr. Perea located?
20    A. Yes.
21    Q. What was their demeanor as far as you recall?
22    A. They just kept on advising that he was either
23 going to hurt himself or someone else, and he wasn't
24 acting himself, and they wanted him to be located.
25    Q. And after learning that information, is that

## Page 62

1  Q. -- on this list; is that correct?
2  A. That is correct.
3  Q. Now, there's also some times in between -- or
4  listed right next to each date, correct?
5  A. Yes.
6  Q. Now, do those times indicate each time -- to
7  your knowledge, what do those times indicate, I should
8  ask?
9  A. Those times indicate each time a cycle was
10 started for a -- so the first one was the probes, and
11 then each one after that would be a contact.
12 Q. So the times -- when you're saying those times
13 indicate each cycle started, what does that mean in
14 plain English?
15 A. It means that -- so where it says number 2 and
16 has the 16:12:28, that is when I initiated the first
17 contact.
18 Q. That's the first contact tase?
19 A. Yes.
20 Q. And the first probe -- the probe tase was at
21 16:12:21?
22 A. Yes.
23 Q. So there was time in between the first two
24 applications?
25 A. Yes.

## Page 63

1  Q. And based upon -- and I've done a little bit of
2  the math. Would that be approximately seven seconds?
3  A. Yes.
4  Q. And then between 2 and 3 -- and in the far,
5  left-hand corner, it's 0064 and 0065 -- what does that
6  indicate?
7  A. That there was a -- there was a time in between
8  when each one was activated, each contact.
9  Q. So these -- so the times indicating from the
10 handwritten numbers, 2 to 10, are all those contact
11 tases?
12 A. Yes.
13 Q. And those are the pain compliance?
14 A. Yes.
15 Q. So those contact tases, were there seconds or
16 minutes in between those -- each contact tase?
17 A. Yes.
18 Q. And would those be reflected on the times that
19 are indicated on this list?
20 A. Yes.
21 Q. So, for example, between contact tase where it
22 says 2 and 3 -- numbers 2 and 3, does that look like
23 approximately 11 seconds?
24 A. Yes.
25 Q. And between 3 and 4, that would be

## Page 64

1  approximately 22 seconds?
2  A. Yes.
3  Q. And between 4 and 5, approximately 16 seconds;
4  is that correct?
5  A. Yes.
6  Q. Between 5 and 6, approximately 10 seconds in
7  between Taser applications?
8  A. Yes.
9  Q. And in between 6 and 7, approximately 23
10 seconds?
11 A. Yes.
12 Q. And in between 7 and 8, approximately 12
13 seconds?
14 A. Yes.
15 Q. And in between 8 and 9, 7 seconds?
16 A. Yes.
17 Q. And in between 9 and 10, about 6 seconds?
18 A. Yes, ma'am.
19 Q. And it looks like there's a handwritten total
20 of one minute and 54 seconds. Does that indicate to you
21 that that is the entire time frame in which the Taser
22 had been utilized?
23 A. Yes.
24 Q. But not during that entire duration?
25 A. There was always pauses in between.

## Page 65

1  Q. So when you say there were pauses in between,
2  what was going on in between those pauses?
3  A. Attempting to take control of Mr. Perea's arms.
4  Q. So were you giving him an opportunity to
5  comply?
6  A. Yes.
7  Q. What was he doing, if anything, between the
8  different pauses?
9  A. Continuing to resist myself and Officer Baca.
10 Q. And is that reflected on the lapel video?
11 A. Yes.
12 Q. When you say he was resisting, can you give us
13 an idea of what he was physically doing to resist?
14 A. He was pushing away from us and striking us
15 several times and hiding his arms underneath his body.
16 Q. And during this one minute and 54 seconds, as
17 you're applying the Taser, at some point did you observe
18 him strike anybody?
19 A. Yes.
20 Q. Who did you observe him strike?
21 A. Officer Dave Baca.
22 Q. And how was Officer Baca struck, if you know?
23 A. He had a -- Mr. Perea had a crucifix in his
24 hand, and he was hitting Officer Baca in the head with
25 the crucifix.

## Page 70

1  correct?
2  A. Yes.
3  Q. So in other words -- so like I said, if we went
4  through each one of these cycles to get the real time in
5  terms of between each cycle, you have to reduce it by
6  the number of seconds that the contact was had?
7  A. Yes.
8  Q. So in other words, when we say between 5 and 6,
9  that there was 10 seconds, there was actually only 5
10 seconds, right, because you had 5 seconds of contact --
11 A. Yes.
12 Q. -- correct?
13     I have nothing further.
14     MS. GRIFFIN: Okay. We'll read and sign.
15     (The deposition concluded, 11:08 a.m.)

## Page 71

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MERLINDA PEREA, AND FRANCINE
PUENTES, Co-Personal
Representatives of the
Wrongful Death Estate of
JERRY PEREA and ON BEHALF
OF THE MINOR, BP,

        Plaintiffs,

vs.                    No. CIV 13-263 RB-RHS

CITY OF ALBUQUERQUE,
ALBUQUERQUE CITY POLICE,
APD OFFICER DAVID BACA and
APD OFFICER ANDREW JARAMILLO,

        Defendants.

CERTIFICATE OF COMPLETION OF DEPOSITION

I, Mary C. Hankins, Certified Court Reporter in and for the State of New Mexico, CCR No. 20, and Registered Professional Reporter, DO HEREBY CERTIFY that on Wednesday, July 30, 2014, the deposition of ANDREW JARAMILLO was taken before me at the request of, and sealed original thereof retained by:

Attorney for the Plaintiffs
SANTIAGO E. JUAREZ, ESQ.
1822 Lomas Boulevard, Northwest
Albuquerque, New Mexico 87102
    I FURTHER CERTIFY that copies of this certificate have been mailed or delivered to the following Counsel of record and parties not represented by Counsel:

Attorney for the Defendants
STEPHANIE M. GRIFFIN, ESQ.
CITY OF ALBUQUERQUE
OFFICE OF THE CITY ATTORNEY
One Civic Plaza, Northwest, Room 405
Albuquerque, New Mexico 87102
    I FURTHER CERTIFY that examination of this

## Page 72

1  transcript and signature of the witness was REQUIRED by
2  the witness and all parties present.
3      On _____, a letter was mailed or delivered to STEPHANIE M. GRIFFIN, ESQ. regarding obtaining signature of the witness.
4      I FURTHER CERTIFY that the recoverable cost
5  of the original and one copy of the deposition, including exhibits, to SANTIAGO E. JUAREZ, ESQ., is
6  $_____.
7      I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this
8  deposition; that I did thereafter report in stenographic
9  shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcription of
10 the proceedings had upon the taking of this deposition to the best of my ability.
11     I FURTHER CERTIFY that I am neither
12 employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys
13 in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

    _____
    Mary C. Hankins, CCR, RPR
    Paul Baca Professional Court Reporters
    New Mexico CCR No. 20
    Date of CCR Expiration: 12/31/2014

## Page 73

MERLINDA PEREA, AND FRANCINE PUENTES vs. CITY OF ALBUQUERQUE.

WITNESS SIGNATURE/CORRECTION PAGE
If there are any typographical errors to your deposition, please indicate them below.

PAGE    LINE
_____ Change to _____
_____ Change to _____
_____ Change to _____
_____ Change to _____

If there are any other changes to your deposition, please list them below with a statement as to the reason for such change.

PAGE    LINE    CORRECTION    REASON FOR CHANGE
_____
_____
_____
_____

I, ANDREW JARAMILLO, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition July 30, 2014, except for the changes made.

                    _____
                    ANDREW JARAMILLO