```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW MEXICO
 2

 3   MERLINDA PEREA, AND FRANCINE
     PUENTES, Co-Personal
 4   Representatives of the
     Wrongful Death Estate of
 5   JERRY PEREA and ON BEHALF
     OF THE MINOR, BP,
 6
                    Plaintiffs,
 7
        vs.                              No. CIV 13-263 RB-RHS
 8
     CITY OF ALBUQUERQUE,
 9   ALBUQUERQUE CITY POLICE,
     APD OFFICER DAVID BACA and
10   APD OFFICER ANDREW JARAMILLO,

11              Defendants.

12

13              DEPOSITION OF DAVID BACA
14                   July 30, 2014
                      1:34 p.m.
15          Paul Baca Professional Court Reporters
             500 4th Street, Northwest, Suite 105
16              Albuquerque, New Mexico 87102

17

18              PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:
19

20   TAKEN BY:      SANTIAGO E. JUAREZ
                    Attorney for the Plaintiffs
21

22   REPORTED BY:   Mary C. Hankins, CCR, RPR
                    New Mexico CCR #20
23                  Paul Baca Professional Court Reporters
                    500 4th Street, Northwest, Suite 105
24                  Albuquerque, New Mexico 87102
                    (505) 843-9241
25
```

EXHIBIT D

Page 6

1  that day?
2  A. Yes.
3  Q. And how do -- how -- how you recall being
4  summoned, I would assume, to the -- to the -- to the
5  place where the incident occurred?
6  A. You mean dispatched?
7  Q. Yeah.
8  A. They put out a dispatch over the air.
9  Q. What do you recall of that dispatch?
10 A. Specifically?
11 Q. Yes, sir.
12 A. Okay. Well, I'm going to review my -- I'm
13 going to review the CAD from my thing, and I'll tell you
14 exactly how.
15 Q. Sure.
16 A. I remember I was the acting sergeant that day,
17 and I remember dispatch had called out over the air
18 looking for a unit -- looking for a unit to take call,
19 take a priority -- priority one call, because they
20 usually put that over the air if there are no units
21 available. So I was acting sergeant, so they advised me
22 there was a call pending. I said, Okay, go ahead and
23 send it to me. And one of our bike officers, Officer
24 Jaramillo, had cleared his call that he was on and said
25 he'd be en route, also.

Page 7

1  Q. Okay. And what do you recall the information
2  on the CAD was in terms of what kind of a call you were
3  headed towards?
4  A. Domestic.
5  Q. I'm going to ask you: The CAD that you're
6  referring to -- I'd like to show you what was marked as
7  Exhibit 2 to Mr. Jaramillo's deposition, see if that's
8  what you're referring to. It's a printout of the CAD.
9  Is that similar to the one that you have?
10 A. Yes.
11 Q. Okay. And in that -- in that particular CAD,
12 there were two calls, one that came in about 9:34:48; is
13 that correct?
14 A. No. Mine says 9:33:22.
15 Q. Okay. 9:33:22.
16 A. Isn't that what yours says?
17 Q. Right. Okay. It says "Entry," right?
18 A. "Created" is what we go off of. That's when --
19 that's when the call was created.
20 Q. Okay. So the call was created on 9:33:22?
21 A. Yes.
22 Q. And family dispute, correct?
23 A. Yes.
24 Q. Okay. Now, looking at the entry, 9:34:48, it
25 indicates that the caller indicated that the subject

Page 8

1  that was being called about had thrown -- items inside
2  20, meaning the residence or the location; is that
3  correct?
4  A. Yes.
5  Q. And then --
6  A. Did you want to go through the whole statement,
7  because you're only picking out little parts? Did you
8  want to go through the whole statement that was created?
9  Q. Yeah. That's fine with me.
10 A. It says there is a male subject and a verbal
11 32, which is a fight, and was throwing items inside the
12 residence.
13 Q. Okay. And it identifies the subject as the --
14 it's a mother and son dispute?
15 A. Yes.
16 Q. And it identifies the subject as Jerry Perea?
17 A. Yes.
18 Q. And what does the CAD say -- or what did it
19 indicate about weapons?
20 A. All it says is "negative 57/weapons."
21 Q. Which means?
22 A. Negative drugs, negative weapons.
23 Q. Now, there is actually then -- that was one
24 call that came in actually from the mother, right, or
25 from -- yeah.

Page 9

1  A. Yes.
2  Q. Okay. Then there is a second call that came
3  in, correct, at 9:47:22, generated by -- it would appear
4  to be a neighbor?
5  A. Yes.
6  Q. And that neighbor appeared to be calling
7  because he had some concern that Mr. Perea was outside
8  in the front yard carrying a Bible saying, Forgive me,
9  forgive me, forgive me?
10 A. More or less, yes.
11 Q. And it appears that the neighbor was concerned
12 because he hadn't seen the two -- the elderly couple,
13 and he was concerned. He didn't know why this person
14 was in the front yard saying, Please forgive me, so he
15 was concerned for the welfare of the two people in the
16 house?
17 A. Yes.
18 Q. And you responded to that call?
19 A. Yes.
20 Q. Who was first on the scene?
21 A. We both arrived about the same time.
22 Q. And as I understand it, you didn't park right
23 in front of the house. You parked down the street a
24 little?
25 A. Yes.

3 (Pages 6 to 9)

Page 10

1  Q. And as you parked down the street, about how
2  far did you park from the actual house where the
3  incident had generated itself?
4  A. I think in my deposition [sic], I said about
5  two or three houses down.
6  Q. Okay. And you had a clear view of the house
7  where the incident took place from where you parked your
8  cars?
9  A. Is that a question or --
10 Q. It's a question.
11 A. -- are you making a statement?
12 Q. It's a question.
13 A. Okay. Yes, I did.
14 Q. And did you see anybody -- before you had any
15 contact with anybody in the house, did you see anybody
16 else -- did you see anybody leaving the house or the
17 area?
18 A. No.
19 Q. And then what did you do?
20 A. I went -- I think I went to the side of the
21 house, and Officer Jaramillo went to the front of the
22 house.
23 Q. And did you have any contact with any of the
24 residents in the house?
25 A. I didn't.

Page 11

1  Q. Officer Jaramillo did?
2  A. Yes.
3  Q. Did you have an opportunity to view the
4  occupants who came out of the house?
5  A. Yes. I saw a lady.
6  Q. You saw the lady.
7      Did you see a man?
8  A. No.
9  Q. And Mr. Jaramillo -- Officer Jaramillo --
10 excuse me -- had a discussion with the woman?
11 A. Yes.
12 Q. Did you have any verbal -- did you have any
13 verbal contact with any of the occupants of the house?
14 A. No.
15 Q. So any and all information that was received at
16 that point from the occupants was received by Officer
17 Jaramillo?
18 A. Yes.
19 Q. And then I take it Officer Jaramillo relayed to
20 you that the suspect, the person who the call had been
21 issued on, Mr. Perea, had left the area?
22 A. Yes.
23 Q. And did you get any -- let me ask -- all the
24 information -- tell me if I'm correct -- at that moment
25 when you're at the house yourself, that you received

Page 12

1  regarding Mr. Perea, came from Mr. Jaramillo -- Officer
2  Jaramillo? I'm sorry.
3  A. No.
4  Q. Where did you get other information from?
5  A. Dispatch.
6  Q. What information did you get from dispatch?
7  A. The one that we just -- the one that we just
8  went over. Do you want me to repeat that again?
9  Q. No.
10    I'm talking about at the house itself.
11 A. It was from Officer Jaramillo.
12    MS. GRIFFIN: Can we take a break?
13    MR. JUAREZ: Sure.
14    MS. GRIFFIN: Thank you.
15    (Break taken, 1:47 p.m. to 1:50 p.m.)
16 Q. (BY MR. JUAREZ) So I take it then -- we were at
17 the point of talking about the information you had
18 received on site was primarily coming from Officer
19 Jaramillo.
20 A. Yes.
21 Q. And did he indicate to you where the subject
22 was at or what had happened with the subject?
23 A. Yes.
24 Q. What was that?
25 A. He stated he left the area on a bike.

Page 13

1  Q. Okay. And gave you a general direction which
2  he fled or --
3  A. Yes.
4  Q. -- in which he was going?
5  A. Yes.
6  Q. And at that point what did you both do?
7  A. I called and asked for our air support, because
8  I knew our air support had arrived on scene, because I
9  guess they heard the call. And I asked them if they had
10 seen any subjects leaving the area.
11 Q. And?
12 A. They said yes, they did.
13 Q. Did you get any information as to what
14 direction he was headed?
15 A. It didn't make sense, but from what they were
16 telling me, they said that he left southbound. But it
17 didn't make sense because the road we were on was an
18 east-west road.
19 Q. Yeah.
20 A. So we proceeded westbound.
21 Q. And did either one of you eventually make
22 contact? Which one of you first made contact with the
23 suspect?
24 A. Officer Jaramillo.
25 Q. And how did you become aware of that?

4 (Pages 10 to 13)

Page 18

1  Q. So when you have contact with Officer Jaramillo
2  and Mr. Perea, what are they doing?
3  A. They're -- we were just -- I think everything
4  was just going up -- we were just about ready to
5  approach the fence, and it seemed like there was already
6  an altercation; a physical altercation had already
7  ensued.
8  Q. That Jaramillo -- that Officer Jaramillo and
9  Perea are getting into?
10  A. Yes.
11  Q. And you go to assist Officer Jaramillo,
12  obviously?
13  A. Yes.
14  Q. And at that point, it's a struggle that starts
15  to take place between the three of you, and that's been
16  described by Officer Jaramillo, where Mr. Perea is
17  resisting being handcuffed?
18  A. He wasn't being handcuffed yet, but yes, he was
19  resisting.
20  Q. He was resisting being detained or whatever?
21  A. Yes.
22  Q. And at some point -- and I refer to your --
23  your statement, you call out something about tasing,
24  correct? We've got to tase him? Do you recall?
25  A. Yes. I used those words.

Page 19

1  Q. Okay. I refer to your statement on page 10,
2  somewhere maybe about line 11. Is that how you recall
3  that whole incident where the first tasing takes place?
4  A. Yes.
5  Q. Now, it was Officer Jaramillo who deployed the
6  Taser, correct?
7  A. Yes.
8  Q. And do you recall when he deploys his Taser,
9  it's in -- what do you call it -- the stand-alone mode
10  or -- it's not the contact mode?
11  A. It's got a cartridge in it.
12  Q. It's got a cartridge in it?
13  A. Yes.
14  Q. And when he deploys it, do you recall where the
15  subject -- where Mr. Perea was hit?
16  A. Yes. He was hit in the -- we were facing each
17  other. He was hit in the chest.
18  Q. And then what happened after that stand-off
19  mode? I'm sorry. Stand-off mode is what I --
20  A. He pulled the -- he pulled prods out.
21  Mr. Perea pulled the prods out, so obviously they
22  weren't effective.
23  Q. And then what happened?
24  A. Then we both made advances again towards him
25  and continued with the physical struggle.

Page 20

1  Q. And during this time, you never -- you never --
2  you never pulled your Taser out?
3  A. No.
4  Q. Were you aware that Officer Jaramillo had his
5  Taser in his hand?
6  A. Yes.
7  Q. And are you aware how many times Officer
8  Jaramillo struck the subject with his Taser?
9  A. No.
10      MS. GRIFFIN: Object to form.
11  A. No.
12  Q. (BY MR. JUAREZ) Describe to me eventually,
13  then, what happens.
14  A. We continued struggling. He was a lot bigger
15  than us. We could not get him under control. I know I,
16  several times, told him to -- because I could see
17  Mr. Perea looking at me several times, and I'm just
18  telling him to concentrate on me, look at me, because it
19  seemed like he was looking right through me. So I kept
20  telling him to concentrate on me, listen to me, trying
21  to put his hands behind his back and numerous times,
22  Quit resisting, quit resisting, put your hands behind
23  his [sic] back. We couldn't do it. He was throwing us
24  around, back and forth, both of us. And sometimes we
25  were able to get an arm, but then he'd locked an arm

Page 21

1  underneath him. We'd go back and forth like that.
2      And finally I was able to get an arm out,
3  put a handcuff on. And we'd struggle more and finally
4  be able to make headway, if you want to call it, and get
5  both arms, finally.
6  Q. And then something else happened?
7  A. Yeah. He struck me in the head several times
8  during the fight. I don't know what was in his hand,
9  until later. And I guess during all that struggle and
10  then that's when we got the handcuffs on him finally.
11      And I called out -- immediately after I got
12  the handcuffs on him, I made a first dispatch, told them
13  subject was in custody and to send me 43, 55, which is
14  rescue and ambulance, reference a tasing, and to send a
15  field investigator and supervisor reference a tasing.
16  Q. And at some point in time, you administered CPR
17  to Mr. Perea?
18  A. Yes.
19  Q. What had happened?
20  A. (Witness pausing.)
21      THE WITNESS: I want to take a break.
22      MS. GRIFFIN: Let's take a break.
23      (Break taken, 2:01 p.m. to 2:05 p.m.)
24  Q. (BY MR. JUAREZ) All right. We had indicated
25  that at some point it appeared to you that Mr. -- that

6 (Pages 18 to 21)

Page 22

```
 1   you started to give CPR. Something happened that you
 2   gave Mr. Perea CPR.
 3       A.  Yes.
 4       Q.  What happened?
 5       A.  After I got handcuffs on, told dispatch to send
 6   rescue and ambulance regarding a tasing, he was still
 7   kicking and flailing around. And I know I was holding
 8   him for a little bit, and then all of a sudden, we
 9   turned -- because of the way he was -- we were right up
10   against the fence. I remember I turned him over on his
11   side for a little bit. Probably -- I don't know --
12   partially on his side because he was a big boy.
13            He, all of a sudden -- me and Andrew were
14   checking each other. I says, You okay? He says -- he
15   says, Are you okay? He said something about your head's
16   hurt. I'm fine. All of a sudden, he stopped moving.
17   He wasn't kicking around or moving his arms or anything
18   like that. So I looked at him, and he looked like he
19   was turning blue and gray. So I turned him all the way
20   on his back, checked for a pulse and checked for
21   breathing. He didn't have any, so I told dispatch to
22   tell the rescue to step it up because I had somebody
23   that wasn't breathing. So I started CPR on him.
24       Q.  And you were able to revive him?
25       A.  Yes.
```

Page 23

```
 1       Q.  And then what happened after you revived him?
 2       A.  I guess at that time everybody started arriving
 3   on scene. I know Albuquerque Fire got on the scene
 4   first. And I told the paramedics what had happened. I
 5   said, He was tased, and then I said, We got him
 6   handcuffed. And then I told them that he stopped
 7   breathing and he didn't have a pulse, and I did CPR on
 8   him. And then they took over.
 9       Q.  And then he had seemed calm, as I understand
10   it, and then he started acting out again?
11       A.  Yes.
12       Q.  And what kind of acting out behavior did he
13   have that you recall?
14       A.  He started kicking at them. He spit -- he spit
15   all -- he was spitting all over them, spit a mouthful of
16   blood on one of the -- the one that was treating him.
17   And then he was banging his head. He kept on banging
18   his head really hard. He was faceup at that time. They
19   were checking him out. He was faceup, banging his head.
20   So I went to my patrol unit, and I got the headgear and
21   put it on him. And then that's when they told me that
22   he was spitting all over everybody, so Officer
23   Jaramillo, I gave him my keys, and he went to my unit
24   and got a spit sock.
25       Q.  And while you were there, did it appear that he
```

Page 24

```
 1   went -- Jerry went into distress again; Mr. Perea went
 2   into distress again?
 3       A.  Yeah.
 4       Q.  Did he actually stop breathing again? Could
 5   you tell?
 6       A.  Well, I don't know about stop breathing. They
 7   turned him over to give him all their medical stuff.
 8       Q.  Right.
 9       A.  They were trying to give him that pulse ox.
10   That's what I learned that it was. But he kept
11   clenching his fists, and then he would kick his feet.
12   He was kicking his feet. So we were trying to -- trying
13   to get his fingers open to put that pulse ox on him.
14   And the medic was still standing there, so I stepped
15   back. I stepped back. And I remember they were still
16   trying to get his finger -- get that stupid thing on his
17   finger.
18            And finally I didn't see him doing anything
19   anymore. I told the medics a couple of times, Guys,
20   he's not moving. They said, Hold on; we're trying to
21   put -- Guys, he's not moving. And then they finally
22   turned him over, and that's when they checked him. He
23   wasn't breathing, and I -- (crying).
24       Q.  I know it's difficult, Officer.
25            MS. GRIFFIN:  Do you want to take another
```

Page 25

```
 1   break?
 2            THE WITNESS:  No.
 3            I took off the headgear.
 4       Q.  (BY MR. JUAREZ) And then they took off?
 5       A.  Yeah.
 6       Q.  Now, what is CIT?
 7       A.  Crisis Intervention Team.
 8       Q.  And did anybody call -- what is the function of
 9   CIT, of the Crisis Intervention Team?
10       A.  They're specially trained officers that have
11   gone through more training in dealing with people that
12   are in crisis. It could be anything, a range of
13   anything of somebody that's in crisis.
14       Q.  And do these officers get certified?
15       A.  Yes.
16       Q.  Are you CIT certified?
17       A.  Yes.
18       Q.  And you were so certified on that day?
19       A.  Yes.
20       Q.  And did you give a call to the CIT team, or did
21   you feel that, you know, you pretty much had the
22   training?
23       A.  I don't know what you mean.
24       Q.  There is a CIT -- there is a unit?
25       A.  No.
```

7 (Pages 22 to 25)