```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW MEXICO
 2

 3   MERLINDA PEREA, AND FRANCINE
     PUENTES, Co-Personal
 4   Representatives of the
     Wrongful Death Estate of
 5   JERRY PEREA and ON BEHALF
     OF THE MINOR, BP,
 6
                Plaintiffs,
 7
        vs.                              No. CIV 13-263 RB-RHS
 8
     CITY OF ALBUQUERQUE,
 9   ALBUQUERQUE CITY POLICE,
     APD OFFICER DAVID BACA and
10   APD OFFICER ANDREW JARAMILLO,

11              Defendants.

12

13              DEPOSITION OF ANDREW JARAMILLO
14                      July 30, 2014
                        9:37 a.m.
15              Paul Baca Professional Court Reporters
                500 4th Street, Northwest, Suite 105
16                 Albuquerque, New Mexico 87102

17

18              PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:
19

20   TAKEN BY:      SANTIAGO E. JUAREZ
                    Attorney for the Plaintiffs
21

22   REPORTED BY:   Mary C. Hankins, CCR, RPR
                    New Mexico CCR #20
23                  Paul Baca Professional Court Reporters
                    500 4th Street, Northwest, Suite 105
24                  Albuquerque, New Mexico 87102
                    (505) 843-9241
25
```

PLAINTIFF'S EXHIBIT 1

### Page 10

1  "Comment." Correct?
2  A.  9:58:47? Yes.
3  Q.  Now, I've read through this, and I don't
4  understand the codes, and maybe you can help me
5  understand this.
6  A.  Okay.
7  Q.  At one point this call starts out as a -- if
8  you look at page 1, the 9:48:12 --
9  A.  Uh-huh.
10  Q.  -- and it goes "Priority 2, dot, dot, dot,
11  less than sign 1." What does that mean to you?
12  A.  It was changed from a priority two to a
13  priority one, meaning that there was an incident that
14  didn't meet -- there was an immediate emergency. And
15  from the comments on the call, dispatch decided to
16  change it to priority one because things were
17  escalating.
18  Q.  Now, you weren't -- when you get engaged --
19  like you said, you don't get engaged until 9:51:24.
20  A.  Yes.
21  Q.  At that point in time, what did you understand
22  the priority to be?
23  A.  At that point it was priority one. And that's
24  the reason why -- they're requesting officers to clear
25  for the call. Being it's a priority one, they don't let

### Page 11

1  it hold at all.
2  Q.  Okay. So what information did you have?
3  A.  At that point all I knew is that it was a
4  priority one, and they needed officers to clear. I
5  didn't find out about the details of the call until I
6  got to my unit and was able to read what was on 9:33 and
7  9:47.
8  Q.  Okay. So you get to your car, and then you're
9  able to read on the screen of your vehicle -- is that
10  what it is?
11  A.  Yes.
12  Q.  -- as to what you're approching?
13  A.  Yes.
14  Q.  And I would assume that's the standard
15  procedure, to get to your car, and before you head out
16  to the site, you want some information?
17  A.  Yes.
18  Q.  And the information that I see, if you look at
19  9:34:48, is a description of the individual throwing
20  items inside the house. Says "Inside 20." 20 is like
21  when we used to play on CB radios and say, What's your
22  20?
23  A.  That's location.
24  Q.  That means location?
25  A.  Yes, sir.

### Page 12

1  Q.  Okay.
2  A.  Where was that at?
3  Q.  It's 9:38:48, "Entry." It says: "Mother/son
4  dispute - CLR." What is CLR?
5  A.  Caller.
6  Q.  "Caller advising male subject was in verbal
7  32." What's 32?
8  A.  In a verbal fight, argument. 32 means fight.
9  Q.  It says "verbal 32," right?
10  A.  Yes.
11  Q.  So a verbal fight?
12  A.  (Indicating.)
13  Q.  And he was throwing items inside the house,
14  inside the 20, inside the location?
15  A.  Yes.
16  Q.  And then they describe the suspect, right?
17  A.  Yes, sir.
18  Q.  It says: "Son is in bedroom of 20," of the
19  house or location, you say. "Poss on 58 [sic]." What
20  does that mean?
21  A.  57. Possibly on narcotics.
22  Q.  Okay. 57 is narcotics. "Unknown what type."
23       "Negative 57 weapons." What does that
24  mean? I'm sorry. I didn't mean to say negative. "Neg
25  57 weapons." What does that mean?

### Page 13

1  A.  It means negative drugs or weapons that the
2  caller's stating.
3  Q.  So the caller's stating negative on drugs and
4  weapons?
5  A.  Yes. But it did mention right before that that
6  he's possibly on drugs, but negative.
7  Q.  Okay. And then "Clear requesting 34S."
8  A.  Caller's requesting officers.
9  Q.  Okay. Then we go down to 9:47:22. And if
10  there is any information I'm missing, that you say,
11  Well, this means something, please point it out to me.
12  A.  Yes, sir.
13  Q.  Because the only thing I can focus on, being
14  untrained, is on the bigger numbers and words. Okay?
15  A.  Just to advise, that's the reason why I was a
16  party, too, because the information given was only
17  verbal at that point and things were escalating. That
18  was the reason I was a party, too, when it first came
19  out. But because of that information at 9:47:22, that's
20  when dispatch decided to change it to priority one.
21  Q.  Okay. And actually if we look at 9:47:22,
22  that's a different caller than the call that was -- that
23  precedes that, right?
24  A.  Yes, sir.
25  Q.  And as I understand that call, with the numbers

4 (Pages 10 to 13)

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE NM 87102

1  and stuff as you have indicated, that caller is saying
2  that he's concerned because this suspect, Jerry, is
3  outside pacing back and forth with a Bible in his hand,
4  asking for forgiveness on what he's done.
5      A. Uh-huh.
6      Q. And that caller requests a welfare check,
7  right?
8      A. Yes, sir.
9      Q. Again, nothing said about guns, weapons of any
10 kind, right?
11     A. Yes, sir. No, sir. But right above that,
12 there is a -- on 9:35:44, it's target hazard.
13     Q. Yeah.
14     A. And use caution. 48 is caution.
15     Q. Okay.
16     A. I don't know the exact details what the caution
17 was, but usually whenever there is a specific house
18 where there's an added risk of danger, they have a
19 hazard on a specific house, and this house was one of
20 those homes that had a hazard.
21     Q. But it didn't say particularly what?
22     A. I believe it did. I just can't remember.
23     Q. Okay. And then -- so you pick up the call.
24 You get this information, and you get over to the house.
25     A. Yes, sir. Can I --

1      Q. Go ahead.
2      A. On the hazard, right at the end of 47:22 --
3  9:47:22, it says: "Use 48. See hazard for listed
4  location."
5      Q. Yeah.
6      A. On that, I believe that there was another one
7  of these sent to my KTD, my computer, with the hazard
8  that had the details with Jerry Perea.
9      Q. So you think that this is an incomplete CAD?
10     A. This is not. It's going to be -- it's
11 available through our dispatch to be able to pull the
12 hazard for that location, and it's sent to us. So this
13 is our CAD, and then a separate message would be sent to
14 us with the hazard of that location.
15         MR. JUAREZ: Well, I know we're at the end
16 of discovery, Counsel, so I don't know if we can request
17 that.
18         MS. GRIFFIN: I'll get you a copy if it
19 still exists.
20         MR. JUAREZ: If it still exists. Thank
21 you, Counsel.
22     Q. (BY MR. JUAREZ) Now, putting this aside, let's
23 go to the house. You get to the house?
24     A. Uh-huh.
25     Q. When you get to the location, what other

1  officers are on scene?
2      A. It's Officer Dave Baca, who was the acting
3  sergeant at that time.
4      Q. Uh-huh. And when you arrive on scene, where is
5  he at?
6      A. We -- I believe we arrived together. And he
7  waited for me to get there, and then we walked and
8  approached the house at the same time.
9      Q. Okay. And when you get to the house, this is
10 the house -- is this the house that caller number two
11 called from or caller number one called from?
12     A. I believe caller number one.
13     Q. Okay. The woman?
14     A. Yes, ma'am -- I mean sir.
15     Q. When you get there, you go knock on the door,
16 or does somebody come out before you get there?
17     A. As we were approaching, an elderly male and
18 female walked out of the residence.
19     Q. At that point in time, do you have your
20 emergency equipment engaged?
21     A. No. As a matter of fact, we parked a little
22 down to make a safe approach.
23     Q. Okay. And when you get there -- on your way to
24 approaching the house, did you notice any individuals,
25 any people running, anything from the house?

1      A. No, sir.
2      Q. I take it that you were focused on the house?
3      A. Yes, sir.
4      Q. And an elderly couple comes out?
5      A. Yes, sir.
6      Q. And who engages them in conversation, you or
7  Officer Baca?
8      A. I believe I did.
9      Q. And tell me the nature of that conversation.
10     A. It was a real short conversation. It was them
11 advising me that the suspect in question had left the
12 residence on a bicycle and that he was possibly on
13 drugs, and they were afraid for his welfare, advising
14 that he was acting -- acting up.
15     Q. Acting erratic?
16     A. Yes.
17     Q. Did you -- since this was -- it changed from a
18 priority one -- I mean from a priority two to a priority
19 one based on the second call as a welfare check,
20 correct?
21     A. Yes, sir.
22     Q. And that was the caller's concern that the
23 individuals, the elderly couple living in the house,
24 might need some assistance?
25     A. Yes.

## Page 18

1  Q. And did you talk to them?
2  A. To the neighbors?
3  Q. No. To the elderly couple.
4  A. Yes, sir.
5  Q. Did you make sure they were okay?
6  A. No, sir.
7  Q. They didn't have any bruises, bumps about them?
8  A. I didn't see any.
9  Q. Did they indicate they had been struck by
10 anybody?
11 A. No.
12 Q. Did they indicate that they had been threatened
13 by any weapons by anybody?
14 A. No. They did indicate that they were afraid of
15 his actions.
16 Q. Okay. In what way were they afraid of his
17 actions? Did you ask?
18 A. I didn't really ask in what way. The fact that
19 they were afraid of his actions says enough.
20 Q. Okay. Well, I know you feel it says enough,
21 but I want to explore that with you a little bit.
22 A. Okay.
23 Q. When they said they were afraid of his actions,
24 were they afraid of his actions that he was going to
25 hurt himself or hurt them?

## Page 19

1  A. They didn't advise me whether --
2  Q. Okay. Did she -- did the woman or did the man
3  say, He threatened to hurt me?
4  A. (Indicating.)
5  Q. You've got to answer.
6  A. No, sir. No.
7  Q. Did he say, He threatened to stab me?
8  A. No, sir.
9  Q. Did they say, He threatened to come back and
10 kill us?
11 A. No, sir. They said that they're afraid of
12 behavior.
13 Q. Okay. Now, there also had been a statement
14 that something had been thrown in the house, right?
15 Furniture?
16 A. Yes, on the CAD, I believe.
17 Q. Okay. Did you go into the house to see any
18 damage that had been done?
19 A. No, sir.
20 Q. So you didn't have any idea of any damage that
21 had been done in the house?
22 A. No, sir.
23 Q. Did you ask them if he had thrown furniture at
24 them?
25 A. No, sir. It was real brief.

## Page 20

1  Q. To your knowledge, did Officer Baca have any
2  such a discussion?
3  A. I don't believe so.
4  Q. Do you know if Officer Baca received any
5  information of any direct threats of harm being made to
6  the elderly couple?
7  A. Not that I'm aware of.
8  Q. Being that there were two calls, the woman's
9  call at the exact location where you showed up and the
10 call from number two -- the number two call, did you
11 engage or go to talk to the people from the number two
12 call?
13 A. No, I did not. I didn't get a chance to.
14 Q. Do you know if anybody did at that time?
15 A. Not at that time, no.
16 Q. But that was the call that changed it from a
17 priority two to a priority one?
18 A. Yes, sir.
19 Q. So to the best of your knowledge, nothing was
20 done to alleviate that caller's fears or concerns?
21 A. At that point, no.
22 Q. So you have this brief discussion with the
23 elderly couple, and they indicate to you that -- and
24 this is their son. Did you at least identify whether he
25 lived there or not?

## Page 21

1  A. Yes, sir.
2  Q. And did you identify it was their son?
3  A. Yes, sir.
4  Q. So you identified it was their son and that he
5  lived there, correct?
6  A. Yes, sir.
7  Q. And then they told you he had left on the bike?
8  A. Yes, sir.
9  Q. And told you which direction he was going?
10 A. Yes, sir.
11 Q. And then you did what?
12 A. At that point I felt that it was important to
13 find the subject, being that -- the fear that he was
14 acting erratic, being that if he's acting in this way --
15 and I don't know him, but the parents, from them knowing
16 him, are saying he's acting this way. I felt that it
17 was in everyone's best interest if we detained the
18 subject, being that he's acting this behavior so that he
19 didn't hurt or do anything else to anyone else or
20 himself.
21 Q. But the knowledge that you had at that
22 particular time, he hadn't hurt anybody, had he?
23 A. No. But due to the -- due to the --
24 Q. Okay. Just answer my question. He hadn't hurt
25 anybody?

1  A. No, sir.
2  Q. To this point he hadn't hurt anybody?
3  A. No, sir.
4  Q. Hadn't hurt himself?
5  A. No.
6  Q. Didn't have a weapon?
7  A. No.
8  Q. The only thing they told you that he had was a
9  Bible?
10 A. I believe so. Well, on the call it stated
11 that. I'm not sure --
12 Q. If the parents told you that?
13 A. Yeah.
14 Q. Okay. And so when you leave to go detain
15 him --
16 A. Uh-huh.
17 Q. You leave the site with the intent of detaining
18 this individual?
19 A. Yes, sir.
20 Q. How do you locate him?
21 A. I was given a direction of travel by the
22 family, by the male and female, and at that point, I
23 just started going in the same direction. And I was
24 able to find a male subject on a bicycle.
25 Q. I know this is not to scale, but what I'd like

1  you to do is draw a general schematic as you can best
2  recall of the area in which you first see what you
3  perceive to be the suspect individual.
4  A. I don't believe it would be accurate being that
5  I haven't been in this area for a while, and it's not
6  fresh in my memory of the actual --
7  Q. Okay. Do you recall what direction or what
8  street you were on?
9  A. From the CAD, it states, "Subject left on bike
10 towards the south of the location," and that's the
11 direction I started looking for this individual. I do
12 believe that I was on 4th Street -- I mean on 2nd
13 Street. I did see him going down -- it's not San
14 Lorenzo. It's that street just north. It might be San
15 Lorenzo that he was on, but I can't remember. I
16 believe, actually, it was San Lorenzo. He was headed
17 west, and at that point, I advised that I had eyes on
18 the individual. And as I was approaching him in my
19 marked police car, he did look back and notice I was in
20 my police car, and he began to pedal a lot faster.
21 Q. Okay. Now, when did you engage your emergency
22 equipment?
23 A. Once he looked back and noticed that -- he saw
24 me, and he began -- his actions were that he was trying
25 to elude me.

1  Q. Well, if you saw a police vehicle -- you didn't
2  have your emergency equipment on, so you don't know --
3  he didn't know you were after him, did he? I mean, that
4  would be a supposition on your part, right?
5  A. Well, his actions showed that --
6  Q. He just started pedalling faster?
7  A. Well, the fact that he looked back at me and
8  made eye contact and then began to take off at a higher
9  speed, at that point I did turn on my lights and sirens
10 to get his attention. He looked back again, saw that I
11 was looking directly at him trying to stop his actions.
12 He then -- instead of stopping, he went straight through
13 to 4th Street, which is a busy street, and caused a few
14 vehicles to slam their brakes, which, you know, he would
15 have got hit if they didn't.
16     He continued through the intersection, and
17 at that point I was able to get ahead of him and place
18 my vehicle in front of him. That made him make a
19 right-hand turn into a parking area of a transmission
20 shop right at 4th and San Lorenzo, and that's when I
21 exited my vehicle.
22 Q. So he's right in front of you, and you say he
23 looks back and sees you?
24 A. Uh-huh.
25 Q. There is no other traffic in front of you?

1  A. No.
2  Q. No other vehicles? Nothing?
3  A. Well, behind me or in front of me on that
4  street, no. There were just parked vehicles. The
5  actual -- on 4th Street, there was a lot of traffic
6  going north to south.
7  Q. Is that controlled by a traffic light?
8  A. No.
9  Q. It's just a stop sign?
10 A. Yes, sir.
11 Q. And he went -- he goes through that street and
12 then turns?
13 A. Because I was able to cut him off, he did turn
14 into the transmission shop.
15 Q. So he's going straight, and you're behind him?
16 A. Yes.
17 Q. And he's pedalling fast?
18 A. Yes.
19 Q. And then you get in front of him and cut him
20 off into the transmission shop?
21 A. Yes.
22 Q. He doesn't turn off into side streets or
23 anything like that?
24 A. No.
25 Q. And so you sort of guide him in, cut him off

1  into the transmission shop?
2  A. Yes, sir.
3  Q. And explain that area to me, the, quote,
4  unquote "transmission shop area."
5  A. It's a gated property, and then you have a
6  transmission shop. There is a covered porch, and he
7  just -- there was an open gate, and he went into the
8  transmission shop.
9  Q. The whole thing is chain-linked off?
10 A. Yes, sir.
11 Q. Now, is there, to the best of your knowledge, a
12 unit there that deals with people who are having
13 psychological problems?
14 A. Yes, we do have one. It's the Crisis
15 Intervention Team.
16 Q. Now, you said on the CAD, there was more
17 information on Mr. Perea.
18 A. Uh-huh.
19 Q. Was part of that information that he had mental
20 problems?
21 A. I believe so, yes.
22 Q. At that point did you seek to contact the
23 Crisis Intervention Team?
24 A. No, being the fact that things were escalating.
25 And I do have -- at that point I did have some training

1  with the Crisis Intervention. It was through the
2  academy where we did training on that.
3  Q. But there is a Crisis Intervention Team?
4  A. Yes, sir. And it takes -- usually takes quite
5  a long time to get them en route. There is officers in
6  the field that are CIT certified, but at that point I
7  was the only one available to answer this call, much
8  less to get a CIT officer en route. Everyone was -- at
9  that point everyone was either on a call or busy with
10 something else. That's the reason I cleared to take
11 this call.
12 Q. Did you indicate to anybody -- did you call
13 anybody to tell them you might need a CIT, a Crisis
14 Intervention Team?
15 A. No, I did not.
16 Q. The immediate crisis or the immediate incident
17 that had brought you and Officer Baca to the scene had
18 somewhat been dissipated by the individual leaving the
19 location, correct?
20     MS. GRIFFIN: Object to form, foundation.
21 A. Yes, sir.
22 Q. (BY MR. JUAREZ) Okay? Is that correct? You
23 can answer the question. Note her objection.
24 A. Yes, sir.
25 Q. And at that point, as I understand the nature

1  of your going to detain this individual, is that you
2  were concerned about him being possibly intoxicated?
3     MS. GRIFFIN: Object to form --
4  A. No, sir.
5     MS. GRIFFIN: -- and foundation.
6  A. The fact that I was looking for him was that he
7  might be a danger to himself or others, being his
8  behavior from the mother and the father.
9  Q. (BY MR. JUAREZ) Okay. What information did you
10 have at that point that you believed made him a danger
11 to himself or to others?
12 A. The fact that people that did know him believed
13 that his behavior was erratic, and he was going to be a
14 danger to himself.
15 Q. And you didn't call in to request the Crisis
16 Intervention Team at that point?
17 A. No, sir, I didn't. I believe that Dave --
18 Officer Dave Baca, at that point, was a crisis
19 intervention officer. He was on scene, and he was with
20 me during this incident.
21 Q. And so you go looking for him. You see him on
22 the street. You engage your emergency vehicle -- your
23 emergency equipment?
24 A. Uh-huh.
25 Q. And you corral him into this transmission area?

1  A. Yes, sir.
2  Q. As best as you can tell, how many exit and
3  entrance gates were in that particular area?
4  A. I believe two.
5  Q. And they were where?
6  A. Where he entered, which was off of San Lorenzo,
7  and I believe there was one off of 4th. I'm not 100
8  percent sure.
9  Q. Okay. So you corral him into the transmission
10 shop, and then what happens?
11     MS. GRIFFIN: Object to form.
12 A. What happened was I positioned my vehicle, and
13 I caused him to go into the transmission shop. I exited
14 my vehicle and began to chase after the individual,
15 advising him that I was a police officer. As I was
16 chasing after him, it looked, at first, like he was
17 going to throw a U-turn and go the opposite way, which I
18 blocked him, but I believe that's when Officer Dave
19 Baca's vehicle blocked him in and made him go into the
20 transmission shop.
21    I ran towards him until he slowed down next
22 to the fence, and that's where I was able to go hands-on
23 with him near the fence.
24 Q. (BY MR. JUAREZ) Okay. Explain to me how the
25 bike was near the fence.

## Page 30

1  A. He was on the bike, and he was close to the
2  fence.
3  Q. Had he stopped pedalling at that point?
4  A. He was -- he was still pedalling.
5  Q. And then what happens when he gets close to the
6  fence?
7  A. I pushed him in towards the fence and -- which
8  caused him to stop. And I hit my knee on his bicycle.
9  We began to -- I began to try to grab his hands in order
10 to stop his hands from -- from striking.
11       During this process, I do remember looking
12 at his face and at first seeing that he was -- you know,
13 it was almost like he was lost, and then it turned into
14 anger. When it turned into anger, he did make a motion.
15 He pulled back his arm. And at the time, I'm not sure
16 what was in his hand, but he had something in his hand.
17 And he lunged towards me in a punching motion and hit me
18 in my chest. And I wasn't sure if he had a knife in his
19 hand or what he had in his hand. So I looked down to
20 make sure that I was okay while I'm still trying to
21 actively grab his hands and saw that nothing was cut on
22 my shirt. I looked back up, and I noticed that it was a
23 crucifix in his hands.
24 Q. So let me see if I get the sequence of events
25 correct, and tell me if I do. So you cut him off in the

## Page 31

1  transmission shop. He seems like he's still going to
2  try to get around you, go back out. Officer Baca drives
3  up in his unit and cuts him off from that particular
4  exit or whatever?
5  A. Yes, sir --
6      MS. GRIFFIN: Object to the form.
7  A. -- to go back onto 4th Street.
8  Q. (BY MR. JUAREZ) You are giving, sort of,
9  pursuit at that time on foot?
10 A. Yes, sir.
11 Q. You get close enough to him that you -- how do
12 you put hands on him when you get close to him?
13 A. When he's on the bike, I just pushed him into
14 the fence.
15 Q. You just shoved him into the fence?
16 A. Yes, sir.
17 Q. And he hit the fence?
18 A. Yes, sir.
19 Q. Okay. And then you went at him and grabbed
20 him?
21 A. Yes, sir.
22 Q. And then he hit you?
23 A. Yes, sir.
24 Q. What is said prior to you putting hands on him?
25 A. I don't believe anything was said. I was in

## Page 32

1  the process of running. But I was in my marked patrol
2  car and in full uniform.
3  Q. Full uniform.
4  A. Correct.
5  Q. And so you hit him against the fence. And
6  after you hit him against the fence, you try to grab
7  him, and then he strikes you back?
8      MS. GRIFFIN: Object to form.
9  Q. (BY MR. JUAREZ) Is that correct?
10 A. I push him into the fence.
11 Q. You said you went to grab his hands.
12 A. Went to grab his hands. I get struck. That's
13 when Officer Baca arrived. We were advising him that
14 we're here to help him, and that's when --
15 Q. Let's get into the struggle. I mean, you're
16 already -- at the point that you say anything to him,
17 you're already involved in a struggle, correct?
18 A. Yes, sir.
19 Q. And so you're struggling with him. You and
20 Officer Baca are struggling with him, and at that point
21 you say, Hey, calm down; we're trying to help you?
22 A. Yes, sir.
23 Q. How long between the time that you first put
24 hands on him and pushed him, you know, up against the
25 fence to the first time you taser him; do you know?

## Page 33

1  A. I don't know. I know it didn't happen
2  instantly. It was a struggle for quite some time before
3  it was actually used.
4  Q. Okay. So then you taser -- at some point you
5  taser him, correct?
6  A. Yes, sir.
7  Q. You both -- and how is that achieved; do you
8  recall?
9  A. We're in the middle of trying to get control of
10 him. It wasn't working. Officer Dave Baca advised me
11 to use my Taser. So at that point, I grabbed my Taser,
12 and I shoot the prongs towards -- in his direction,
13 which it appeared that it hit him. While the Taser was
14 cycling, I did remember seeing him reach towards the
15 string that was attached to the prongs and yank
16 (indicating). And at that point, the Taser wasn't being
17 effective.
18 Q. I'm going to hand you what we're going to mark
19 now as Defendants' Exhibit Number 3 -- I mean
20 Plaintiffs' Exhibit Number 3. Now, I'd like you to look
21 at that and see if you recognize that.
22 A. Yes, sir, I do.
23    (Exhibit Number 3 marked.)
24 Q. It appears to be a transcription of a statement
25 you gave; is that correct, Officer Jaramillo?

1  up the taser, as well as get the other stuff off the
2  floor that was --
3  Q. I'd like you to --
4  A. -- during the struggle.
5  Q. I'd like you look at page 11 of your statement,
6  and reading from line 12, tell me if that's accurate or
7  not.
8  A. (Witness complies.)
9  I was able to get one handcuff on him. He
10 wasn't in full custody yet. He was never tased after he
11 was in our custody. One of the -- one of the handcuffs
12 was on his arms. As -- as he was -- I was reaching to
13 put the other one on his other arm, his arm was pulled
14 back underneath, and then -- so no, he wasn't tased
15 after he was handcuffed.
16 Q. So you figure you tasered him about ten times.
17 And after you get the handcuffs on him, what happens?
18 A. Like I said, I holstered up the Taser. My
19 radio was underneath him. I was trying to get it out
20 from underneath him, so we could let the other officers
21 know that we were okay. I get my radio, realized it was
22 broken.
23 I start, you know, trying to fix myself and
24 catch my breath. I was exhausted. I just remember
25 being exhausted being that I had rode a few blocks. I

Page 47

1  think it was about six blocks to get to my vehicle, and
2  then to chase after him and get in a struggle, I was
3  pretty tired. So I just remember trying to catch my
4  breath. I had my hands on my knees at several points
5  just trying to catch my breath.
6  Then Mr. Perea was handcuffed on the floor,
7  on his stomach, and I believe Officer Baca told me that
8  he stopped breathing. We immediately rolled him over.
9  I went to his head to clear his airway while Officer
10 Baca was doing chest compressions. We did that until he
11 came back, conscious.
12 Q. During the times that you were tasing him, how
13 long were you holding contact on his body; do you
14 recall?
15 A. I believe they were five-second cycles. I'm
16 not sure exactly how long.
17 Q. And how often between cycles; do you recall?
18 A. I only used it when I needed it, when I felt --
19 you know, there were points when I started getting
20 control of his arm and I was pulling it back, but then
21 he started gaining a little more on me, so then I'd use
22 it again. And then I'd get a little more, so on, until
23 I was able to finally get his arm all the way behind him
24 and put that one cuff on, and then the other one came.
25 I mean, Officer -- Officer Baca was able to put the cuff

Page 48

1  on and then the other.
2  Q. Where were you tasing him at on his body; do
3  you recall?
4  A. In his back area.
5  Q. Upper back? Lower back?
6  A. I'm not exactly sure. It was several areas
7  being that it was constant resistance from him.
8  Q. So with the contact Taser that you used, how
9  many times did you hit him in the upper front torso of
10 his body?
11 A. I don't know. I don't know if I did.
12 Q. You think it was mostly in the back when you
13 were trying to get his arm behind him?
14 A. Yes, sir. The way he fell, he was facing
15 Officer Baca, and I was to the right of him. When he
16 fell -- when he started going down and I started using
17 the contact Taser, we pushed him, and he was able -- he
18 landed on his side, and we were able to push him to his
19 stomach.
20 Q. And when you had him on his stomach, how soon
21 after you had the handcuffs on him did you notice he had
22 stopped breathing?
23 A. He was groaning for a while. He was, like,
24 screaming and -- (demonstrating). And I remember
25 looking at his hands, because -- I was up against the

Page 49

1  fence and I had my hands on my knees, and I was trying
2  to catch my breath, and I remember looking at his hands.
3  And he was trying to pull the handcuffs apart. And it
4  didn't -- it didn't appear that he felt any pain because
5  he was doing it with a motion where you could see that
6  it was cutting into his skin, pulling, pulling
7  (demonstrating).
8  Q. And this was when the cuffs were behind his
9  back?
10 A. Yes.
11 Q. You could actually see him struggling with
12 them?
13 A. Yeah. You could see, like, his whole body
14 stiffen up, and he was just trying to yank. And he's
15 trying with all of his might and power to -- to pull
16 these cuffs off. And like I say, I'm trying to catch my
17 breath, and he continues to make these noises. And all
18 of a sudden, he stops making the noises. Officer Baca
19 went to check on him, and that's when he told me that he
20 stopped breathing. We rolled him over to his back right
21 away, and that's when we began to administer CPR.
22 Q. You say he was making noises?
23 A. The noises he was making was -- he was trying
24 to break the handcuffs. He was -- every time he would
25 tighten up his body to yank the cuffs, it was like --

1 themselves.
2  Q. Okay.
3  A. While -- while we were trying to put this
4 headrest on him, you know, one of the firefighters was
5 holding Perea's head so he wouldn't continue to hurt
6 himself, while I was holding his legs, and he started
7 spitting. He spit on Officer Baca's arm. And I
8 remember looking at his arm, and you could see the blood
9 from the spit on his arm. And then he spit in the face
10 of one of the firefighters.
11  Q. So he's laying down, making weird sounds, and
12 then he starts saying, God, forgive me -- or God,
13 forgive them. He's hitting his head. Where did the
14 blood in his mouth come from?
15  A. I believe from the struggle of the incident.
16 I'm not sure exactly where the blood came from, but he
17 did have, I believe, some bleeding on his lip.
18  Q. And then he spit?
19  A. Yes.
20  Q. And when he spit, some of that spit hit Officer
21 Baca and the firefighters?
22  A. Yes, sir.
23       The whole time, our main goal was to make
24 sure that he didn't hurt himself, and, you know, from
25 the beginning to the end, we were trying to help him not

1 hurt himself. And in doing so, we were trying to
2 hold -- you know, the firefighter even helped us by --
3 because there weren't enough officers there, by holding
4 his head so he wouldn't continue to hurt himself. We
5 didn't want him to hurt himself.
6  Q. And at some point in time, did he stop
7 breathing again?
8  A. Yes.
9       We had rolled him over to his stomach
10 whenever he finished spitting on the firefighter and
11 Officer Baca. I ran to Officer Baca's vehicle to get
12 his spit sock to put over Mr. Perea so that he wouldn't
13 continue spitting on us. As we put the spit sock on him
14 and put the headrest back on him, they began to do
15 vitals on Mr. Perea.
16       While they were doing vitals on Mr. Perea,
17 believe they were getting his pulse through the finger,
18 or maybe they were getting blood from him. It was
19 something with his finger, I remember. They were
20 attempting to get some readings on him, and I noticed
21 that he stopped breathing. I believe I told one of them
22 that he might have stopped breathing again.
23       They rolled him back to his stomach,
24 realized that he had stopped breathing. We took off all
25 the headgear, took off the handcuffs, and they began to

1 administer CPR to him.
2  Q. Officer Jaramillo, prior to the police contact
3 with Mr. Perea on this day, had you received, on this
4 day, regarding this incident, any information that
5 Mr. Perea had hurt himself?
6  A. No.
7  Q. Had you received any information that he had
8 hurt anybody?
9  A. No. But his behavior --
10  Q. I appreciate that.
11  A. The information that I got from people that
12 knew this individual is the only information I had, and
13 I had to go based off of what they told me.
14  Q. Let me ask you again. You had no information
15 that he had hurt anybody that day, had you?
16  A. No.
17  Q. And as he was riding down the bicycle -- the
18 bicycle down the road after he left the house, you
19 received no calls from any civilians indicating that he
20 was doing anything wrong, correct?
21  A. No.
22  Q. So the only time Mr. Perea ever hurt himself
23 that day was in your presence after you detained him?
24  A. Yes, sir. From what I'm aware of, yes.
25       MR. JUAREZ: Okay. Let's take a quick

1 break. We might be at the end of this.
2       MS. GRIFFIN: I've got questions.
3       MR. JUAREZ: No, you don't.
4       MS. GRIFFIN: Yes, I do.
5       (Break taken, 10:46 a.m. to 10:52 a.m.)
6       MR. JUAREZ: You can go ahead, Counsel.
7       MS. GRIFFIN: Are you passing the witness?
8       MR. JUAREZ: Yeah.
9       MS. GRIFFIN: Did you get that on the
10 record?
11       (The court reporter responds.)
12       EXAMINATION
13 BY MS. GRIFFIN:
14  Q. I have a few follow-up questions for you,
15 Mr. Jaramillo.
16       First with respect to the call, when you
17 arrived at the residence, did it seem to you that the
18 parents -- or the male and the female that you spoke to,
19 they wanted Mr. Perea located?
20  A. Yes.
21  Q. What was their demeanor as far as you recall?
22  A. They just kept on advising that he was either
23 going to hurt himself or someone else, and he wasn't
24 acting himself, and they wanted him to be located.
25  Q. And after learning that information, is that

## Page 58

1  when you went to go look for him along with Officer
2  Baca?
3      A. Yes.
4      Q. When you did see him, what did you notice him
5  doing on the street?
6      A. I noticed him endangering himself and the
7  people that were driving on 4th Street. The fact that
8  he went through the intersection and almost got hit by a
9  vehicle, he was showing a disregard for himself and the
10 other drivers.
11     Q. So when you went to go detain him, was that a
12 concern of yours, that he was about to harm himself by
13 riding his bike through traffic the way he was?
14     A. Yes.
15     Q. As well as coupled with the information you got
16 from the parents?
17     A. Yes.
18     Q. Now, you were asked a question by Mr. Juarez
19 about if you had any information if he hit anybody. Did
20 it seem to you -- and you had answered no. Did it seem
21 to you from the nature -- from the information relayed
22 in the call that he could have been threatening --
23     A. Yes.
24     Q. -- in his behavior.
25         And what information in the call would

## Page 59

1  indicate threatening behavior?
2      A. In the actual CAD, it stated that he was
3  threatening the mother, and it was a verbal dispute
4  between them.
5      Q. Well, it said that he was throwing -- the
6  caller said he was throwing items inside 20, meaning the
7  location?
8      A. Yes.
9      Q. And are you aware as to whether or not a threat
10 can be based upon threatening or menacing conduct?
11     A. Yes.
12         MR. JUAREZ: Objection. Calls for a legal
13 conclusion.
14     Q. (BY MS. GRIFFIN) And so the information on this
15 9:34:48 entry in the CAD, would that indicate to you
16 there is a possible assault that occurred?
17     A. Yes.
18     Q. Now, I want to ask you about the Taser -- and I
19 think I only have -- we'll mark this as 4 to your
20 deposition. I'll let you have my copy.
21         MR. JUAREZ: I think you provided this in
22 the --
23         MS. GRIFFIN: Yes, sir.
24         MR. JUAREZ: -- in the professional --
25         MS. GRIFFIN: In the initial disclosures

## Page 60

1  and --
2         MR. JUAREZ: I think so, yes.
3      Q. (BY MS. GRIFFIN) Do you recognize what Exhibit
4  4 is?
5      A. Yes.
6      Q. What is it, to your knowledge?
7      A. It's a history of every single time my Taser
8  was activated.
9         (Exhibit Number 4 marked.)
10     Q. Okay. What I want you to do is turn to page 3
11 of this document on Exhibit 4, and there appears to be,
12 on page 3 -- and it starts with a number in the far left
13 corner, 0063, and then there is a date, 3/21/2011. Do
14 you see that? Is that correct?
15     A. Yes.
16     Q. And then there are a series of numbers
17 handwritten by the date, 3/21/2011. Do you see that
18 area?
19     A. Yes, I do.
20     Q. So when you said that you had information that
21 you believe Mr. Perea was tased ten times, is this the
22 source of the information?
23     A. It is.
24     Q. And did you have this information at the time
25 that you were interviewed?

## Page 61

1      A. For the criminal?
2      Q. Yeah.
3      A. No.
4      Q. So when you're saying he was tased ten times,
5  is it based upon -- what do you base that on, I should
6  ask?
7      A. The information I'm seeing here, it has the
8  date and the time stamp of when it was engaged, and it
9  shows on that date that it was used ten different times.
10     Q. Okay. Do you have a specific recollection if
11 Mr. Perea actually was tased ten times?
12     A. Say again.
13     Q. Sitting here today, do you have a specific
14 recollection of tasing Mr. Perea ten times?
15     A. Yes.
16     Q. You do?
17     A. (Indicating.)
18     Q. Yes?
19     A. Yes.
20     Q. Now, the first time, that's when you attempted
21 to use it in the prong mode, correct?
22     A. Yes.
23     Q. And that would have been indicated by the 0063
24 application --
25     A. Yes.

## Page 66

1  Q. And do you recall him doing -- striking
2  anywhere else or anybody else during this --
3  A. Well, he struck me in the chest with that same
4  crucifix.
5  Q. But that was before you started to tase him?
6  A. Yes.
7  Q. Do you know if Officer Baca sustained any sort
8  of an injury or mark from being hit?
9  A. Yes. He did have -- it looked like little
10 welts on his forehead and nose area and some scrapings
11 on his face.
12 Q. And was he wearing sunglasses as well?
13 A. Yes.
14 Q. And do you know what happened with those
15 sunglasses during the struggle?
16 A. Mr. Perea was able to take them off his face,
17 and they were damaged while he was holding him in his
18 hand and trying to use those as a weapon.
19 Q. And this occurred while you're attempting to
20 gain control of him with the tasing?
21 A. Yes.
22 Q. You had indicated in your -- during your
23 interview, you were asked a question about whether or
24 not Mr. Perea was handcuffed and still being tased. Do
25 you recall that line of questioning?

## Page 67

1  A. Yes.
2  Q. Can you just explain a little bit more? You
3  said that he had one handcuff on. Would you consider
4  that to be handcuffed?
5  A. I don't.
6  Q. Why not?
7  A. I feel that when someone's handcuffed, they're
8  in our custody, and both arms are cuffed together, both
9  wrists. And during this altercation, that wasn't done
10 until -- he wasn't handcuffed until both arms were in
11 the -- in the handcuffs.
12 Q. Is Mr. Perea still a threat just with one
13 handcuff being handcuffed on him?
14 A. He's -- in that case, he might --
15    MR. JUAREZ: Objection. Calls for a
16 conclusion.
17 A. -- have been more of a threat, because if we
18 were not able to put the other arm in and he was able to
19 free up his arm with one hand, it could be used as a
20 weapon.
21 Q. (BY MS. GRIFFIN) With the unhinged part of the
22 handcuff?
23 A. Yes.
24 Q. Okay. That's all I have.
25    MS. GRIFFIN: I'll pass the witness.

## Page 68

1     MR. JUAREZ: Okay. Real quick like, I
2  think.
3           FURTHER EXAMINATION
4  BY MR. JUAREZ:
5  Q. When I was asking you earlier about your
6  contact with Mr. Perea, you indicated that you saw him
7  driving on the bike and that not until after you engaged
8  your emergency equipment did he take off to 4th Street;
9  is that correct?
10 A. He was -- he was actively riding his bike. It
11 was about two-thirds of the block up where the street
12 is, and when he turned back and saw me, he started
13 riding faster. So, I mean, he was -- he was on the
14 bike, riding.
15 Q. Prior to that, prior to your contact with him,
16 he wasn't doing anything wrong?
17 A. That's not why I was trying to stop him. It
18 was for his welfare that I was trying to stop him.
19 Q. Right. So you weren't trying to stop him
20 because you saw him doing anything wrong on his bike?
21 A. No, until he actually went through the
22 intersection.
23 Q. After you engaged your emergency equipment?
24 A. Yes.
25 Q. Is that a yes?

## Page 69

1  A. Yes. I said yes.
2  Q. Now, going to this Taser thing on page 3 --
3  A. And just -- just to clarify real quick -- I'm
4  sorry -- that the equipment in my vehicle wasn't engaged
5  until he was in the intersection of 4th Street.
6  Q. Now, going back to the Taser thing on page 3,
7  actually the time stamp doesn't include the amount of
8  time that it was in contact, correct? In other words,
9  if you were to look at 63, number 1, it says 10:22 --
10 10:12:21, and then it has 6 seconds of contact.
11 A. Yes.
12 Q. So that would actually be -- before you engaged
13 it again at 12:28, it would actually have been 1 second
14 between engagements, correct?
15 A. Yes.
16 Q. And that would go through the sequence of the
17 next ten, correct?
18 A. The next five seconds.
19 Q. Yes. Correct?
20 A. Yes.
21 Q. In other words, what happens is you shoot, you
22 hold, then you let go, and then you shoot again, and
23 that's when it cocks it again?
24 A. It starts the five seconds again.
25 Q. It starts the five-second interval again,