```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW MEXICO
 2

 3   MERLINDA PEREA, AND FRANCINE
     PUENTES, Co-Personal
 4   Representatives of the
     Wrongful Death Estate of
 5   JERRY PEREA and ON BEHALF
     OF THE MINOR, BP,
 6
                Plaintiffs,
 7
       vs.                              No. CIV 13-263 RB-RHS
 8
     CITY OF ALBUQUERQUE,
 9   ALBUQUERQUE CITY POLICE,
     APD OFFICER DAVID BACA and
10   APD OFFICER ANDREW JARAMILLO,

11              Defendants.

12

13              DEPOSITION OF DAVID BACA
14                  July 30, 2014
                     1:34 p.m.
15         Paul Baca Professional Court Reporters
            500 4th Street, Northwest, Suite 105
16              Albuquerque, New Mexico 87102

17

18         PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:
19

20   TAKEN BY:     SANTIAGO E. JUAREZ
                   Attorney for the Plaintiffs
21

22   REPORTED BY:  Mary C. Hankins, CCR, RPR
                   New Mexico CCR #20
23                 Paul Baca Professional Court Reporters
                   500 4th Street, Northwest, Suite 105
24                 Albuquerque, New Mexico 87102
                   (505) 843-9241
25
```

PLAINTIFF'S EXHIBIT 2

## Page 10

1  Q. And as you parked down the street, about how
2  far did you park from the actual house where the
3  incident had generated itself?
4  A. I think in my deposition [sic], I said about
5  two or three houses down.
6  Q. Okay. And you had a clear view of the house
7  where the incident took place from where you parked your
8  cars?
9  A. Is that a question or --
10 Q. It's a question.
11 A. -- are you making a statement?
12 Q. It's a question.
13 A. Okay. Yes, I did.
14 Q. And did you see anybody -- before you had any
15 contact with anybody in the house, did you see anybody
16 else -- did you see anybody leaving the house or the
17 area?
18 A. No.
19 Q. And then what did you do?
20 A. I went -- I think I went to the side of the
21 house, and Officer Jaramillo went to the front of the
22 house.
23 Q. And did you have any contact with any of the
24 residents in the house?
25 A. I didn't.

## Page 11

1  Q. Officer Jaramillo did?
2  A. Yes.
3  Q. Did you have an opportunity to view the
4  occupants who came out of the house?
5  A. Yes. I saw a lady.
6  Q. You saw the lady.
7     Did you see a man?
8  A. No.
9  Q. And Mr. Jaramillo -- Officer Jaramillo --
10 excuse me -- had a discussion with the woman?
11 A. Yes.
12 Q. Did you have any verbal -- did you have any
13 verbal contact with any of the occupants of the house?
14 A. No.
15 Q. So any and all information that was received at
16 that point from the occupants was received by Officer
17 Jaramillo?
18 A. Yes.
19 Q. And then I take it Officer Jaramillo relayed to
20 you that the suspect, the person who the call had been
21 issued on, Mr. Perea, had left the area?
22 A. Yes.
23 Q. And did you get any -- let me ask -- all the
24 information -- tell me if I'm correct -- at that moment
25 when you're at the house yourself, that you received

## Page 12

1  regarding Mr. Perea, came from Mr. Jaramillo -- Officer
2  Jaramillo? I'm sorry.
3  A. No.
4  Q. Where did you get other information from?
5  A. Dispatch.
6  Q. What information did you get from dispatch?
7  A. The one that we just -- the one that we just
8  went over. Do you want me to repeat that again?
9  Q. No.
10    I'm talking about at the house itself.
11 A. It was from Officer Jaramillo.
12    MS. GRIFFIN: Can we take a break?
13    MR. JUAREZ: Sure.
14    MS. GRIFFIN: Thank you.
15    (Break taken, 1:47 p.m. to 1:50 p.m.)
16 Q. (BY MR. JUAREZ) So I take it then -- we were at
17 the point of talking about the information you had
18 received on site was primarily coming from Officer
19 Jaramillo.
20 A. Yes.
21 Q. And did he indicate to you where the subject
22 was at or what had happened with the subject?
23 A. Yes.
24 Q. What was that?
25 A. He stated he left the area on a bike.

## Page 13

1  Q. Okay. And gave you a general direction which
2  he fled or --
3  A. Yes.
4  Q. -- in which he was going?
5  A. Yes.
6  Q. And at that point what did you both do?
7  A. I called and asked for our air support, because
8  I knew our air support had arrived on scene, because I
9  guess they heard the call. And I asked them if they had
10 seen any subjects leaving the area.
11 Q. And?
12 A. They said yes, they did.
13 Q. Did you get any information as to what
14 direction he was headed?
15 A. It didn't make sense, but from what they were
16 telling me, they said that he left southbound. But it
17 didn't make sense because the road we were on was an
18 east-west road.
19 Q. Yeah.
20 A. So we proceeded westbound.
21 Q. And did either one of you eventually make
22 contact? Which one of you first made contact with the
23 suspect?
24 A. Officer Jaramillo.
25 Q. And how did you become aware of that?

Page 22

1  you started to give CPR. Something happened that you
2  gave Mr. Perea CPR.
3     A. Yes.
4     Q. What happened?
5     A. After I got handcuffs on, told dispatch to send
6  rescue and ambulance regarding a tasing, he was still
7  kicking and flailing around. And I know I was holding
8  him for a little bit, and then all of a sudden, we
9  turned -- because of the way he was -- we were right up
10 against the fence. I remember I turned him over on his
11 side for a little bit. Probably -- I don't know --
12 partially on his side because he was a big boy.
13    He, all of a sudden -- me and Andrew were
14 checking each other. I says, You okay? He says -- he
15 says, Are you okay? He said something about your head's
16 hurt. I'm fine. All of a sudden, he stopped moving.
17 He wasn't kicking around or moving his arms or anything
18 like that. So I looked at him, and he looked like he
19 was turning blue and gray. So I turned him all the way
20 on his back, checked for a pulse and checked for
21 breathing. He didn't have any, so I told dispatch to
22 tell the rescue to step it up because I had somebody
23 that wasn't breathing. So I started CPR on him.
24    Q. And you were able to revive him?
25    A. Yes.

Page 23

1     Q. And then what happened after you revived him?
2     A. I guess at that time everybody started arriving
3  on scene. I know Albuquerque Fire got on the scene
4  first. And I told the paramedics what had happened. I
5  said, He was tased, and then I said, We got him
6  handcuffed. And then I told them that he stopped
7  breathing and he didn't have a pulse, and I did CPR on
8  him. And then they took over.
9     Q. And then he had seemed calm, as I understand
10 it, and then he started acting out again?
11    A. Yes.
12    Q. And what kind of acting out behavior did he
13 have that you recall?
14    A. He started kicking at them. He spit -- he spit
15 all -- he was spitting all over them, spit a mouthful of
16 blood on one of the -- the one that was treating him.
17 And then he was banging his head. He kept on banging
18 his head really hard. He was faceup at that time. They
19 were checking him out. He was faceup, banging his head.
20 So I went to my patrol unit, and I got the headgear and
21 put it on him. And then that's when they told me that
22 he was spitting all over everybody, so Officer
23 Jaramillo, I gave him my keys, and he went to my unit
24 and got a spit sock.
25    Q. And while you were there, did it appear that he

Page 24

1  went -- Jerry went into distress again; Mr. Perea went
2  into distress again?
3     A. Yeah.
4     Q. Did he actually stop breathing again? Could
5  you tell?
6     A. Well, I don't know about stop breathing. They
7  turned him over to give him all their medical stuff.
8     Q. Right.
9     A. They were trying to give him that pulse ox.
10 That's what I learned that it was. But he kept
11 clenching his fists, and then he would kick his feet.
12 He was kicking his feet. So we were trying to -- trying
13 to get his fingers open to put that pulse ox on him.
14 And the medic was still standing there, so I stepped
15 back. I stepped back. And I remember they were still
16 trying to get his finger -- get that stupid thing on his
17 finger.
18    And finally I didn't see him doing anything
19 anymore. I told the medics a couple of times, Guys,
20 he's not moving. They said, Hold on; we're trying to
21 put -- Guys, he's not moving. And then they finally
22 turned him over, and that's when they checked him. He
23 wasn't breathing, and I -- (crying).
24    Q. I know it's difficult, Officer.
25    MS. GRIFFIN: Do you want to take another

Page 25

1  break?
2     THE WITNESS: No.
3     I took off the headgear.
4     Q. (BY MR. JUAREZ) And then they took off?
5     A. Yeah.
6     Q. Now, what is CIT?
7     A. Crisis Intervention Team.
8     Q. And did anybody call -- what is the function of
9  CIT, of the Crisis Intervention Team?
10    A. They're specially trained officers that have
11 gone through more training in dealing with people that
12 are in crisis. It could be anything, a range of
13 anything of somebody that's in crisis.
14    Q. And do these officers get certified?
15    A. Yes.
16    Q. Are you CIT certified?
17    A. Yes.
18    Q. And you were so certified on that day?
19    A. Yes.
20    Q. And did you give a call to the CIT team, or did
21 you feel that, you know, you pretty much had the
22 training?
23    A. I don't know what you mean.
24    Q. There is a CIT -- there is a unit?
25    A. No.

1  Q. It's just officers that are CIT?
2  A. Yes.
3  Q. Okay. That's what I want to get at.
4     Did you receive any information as to
5  Mr. Perea -- whether Mr. Perea was a person in crisis
6  other than the information that he was acting out at the
7  house?
8  A. I need you to repeat that question because I --
9  I need you to repeat the question because the answer I
10 have, I don't think it fits the question, so if you
11 could repeat the question for me.
12 Q. Okay. In the CAD, when you received
13 information, did you receive any particular information
14 from dispatch regarding Mr. Perea's history with the
15 police or mental -- let's start with history with the
16 police.
17 A. He did have a history with the police.
18 Q. Did you receive any information in terms of his
19 mental status?
20 A. I'm going to have to review the CAD on it. I
21 don't remember specifically (reading).
22 Q. I can tell you right now we don't have that
23 one.
24 A. I remember on my hazard, I know it showed that
25 he fights with officers, and one time he was involved

1  with one of our SWAT -- on a SWAT situation. I remember
2  that on a hazard.
3  Q. Did it indicate to you any mental problems,
4  PTSD? Did you get anything like that? Schizophrenia?
5  Anything like that?
6  A. I don't recall that right off the bat.
7  Q. From the time that you were dispatched to the
8  time that there was contact with Mr. Perea, did you
9  receive any information from anybody that on that day he
10 had hurt anyone?
11 A. You mean other than his mom calling in?
12 Q. Other than his mom calling in and giving you
13 the information she did, did you receive any information
14 he had specifically hurt anyone?
15 A. Just the information from the dispatcher from
16 his mom, that he was being violent.
17 Q. Any information that he had possessed weapons
18 or threatened anybody with a weapon?
19 A. No.
20 Q. When you were on site with the elderly woman,
21 supposedly his mother -- who was his mother -- we can
22 presume who was his mother and Officer Jaramillo, did
23 you observe her to be hurt in any form or fashion?
24 A. No.
25 Q. And you never had contact with the elderly male

1  that was in the house?
2  A. No.
3  Q. And you never went in the house --
4  A. No.
5  Q. -- to see if there was any kind of damage that
6  was supposedly done?
7  A. Not at that time.
8  Q. During the time that Mr. Perea left the site of
9  the house and took off on the bike, did you receive any
10 calls from dispatch indicating that someone was on a
11 bike threatening to harm anybody, harming himself or any
12 erratic behavior?
13 A. No.
14 Q. When was the first time that you recall being
15 verbal with Mr. Perea?
16    MS. GRIFFIN: Object to form.
17 A. The first time was right when I had exited my
18 vehicle and went around and him and Officer Jaramillo
19 were already engaged, right there at the first initial
20 contact with him at the fence when he was -- he was
21 flailing around. That's where I remember him looking
22 right through me. And that's why I kept telling him,
23 Concentrate on me; hey, buddy, I think I remember, or
24 buddy -- it seems to work sometimes when I talk to
25 people in crisis, to concentrate on me. Then he'd slow

1  down a little bit, and it seemed like I'd get his
2  attention for a little bit. And then that was the first
3  time, I believe.
4  Q. (BY MR. JUAREZ) The CAD doesn't indicate any
5  kind of particularized violence, does it?
6  A. As far as?
7  Q. Hitting someone, shooting someone, cutting
8  someone, hitting someone.
9  A. It states -- all it said was it was pretty
10 vague, which means a verbal fight. That was the 32 part
11 and throwing furniture, and it didn't say -- it was
12 general, which means he's throwing furniture around, but
13 it didn't say he had hit anybody, so they leave it as
14 vague.
15 Q. When there is somebody that's struck, is there
16 a code for that, like you said 32?
17 A. They could -- we're going into suppositions
18 now. I mean, I've had everything from subject's 27-4,
19 which means the subject's been battered, or sometimes
20 they just put "struck" or -- they can put all types of
21 different codes on there.
22 Q. So this one was pretty vague; it was nothing
23 specific?
24 A. Right. They also said "negative 57," but that
25 the mom, when she called, said he was on drugs. So