IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MERLINDA PEREA, and FRANCINE
PUENTES, as Co-personal Representatives of the
Estate of JERRY PEREA, and on Behalf of the
Minor, B.P.,

        Plaintiff,

vs.                                                                              No. CIV 13-263 RB/RHS

CITY OF ALBUQUERQUE, ALBUQUERQUE
CITY POLICE, APD OFFICER DAVID BACA,
APD OFFICER ANDREW JARAMILLO,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Jerry Perea died after being tasered ten times by Albuquerque Police Department officers. Plaintiffs, the co-representatives of Mr. Perea's estate, filed a complaint alleging civil rights violations and state tort violations. (Doc. 1.) Defendants moved for summary judgment. (Doc. 48.) Having reviewed the parties' submissions and arguments, the Court **DENIES** the motion in part and **GRANTS** the motion in part.

**I.    BACKGROUND**

On the morning of March 21, 2011, Plaintiff Merlinda Perea called 911, stating that her son was "on very bad drugs." (Ex. A at 2:4-5, Doc. 48-1.) Ms. Perea reported that Jerry Perea was throwing things in the house and she was "afraid of what he might do." (Doc. 48-1 at 2:13-20.) A neighbor also called 911, reporting that Jerry Perea was pacing in his yard, clutching a Bible, and asking for forgiveness. (Ex. 3, Doc. 62-3; Jaramillo Dep., Ex. C 13:21-14:8, Doc. 48-2; Baca Dep., Ex. D 9:2-10, Doc. 48-3.) The operator agreed to send a police officer to the house to perform a welfare check. (Doc. 48-1 at 4; Doc. 48-2 at 17:17-21.)

When Defendant Officers Baca and Jaramillo were dispatched to the house in northwest Albuquerque, the Officers were informed that they were responding to a verbal fight, that the son may be on drugs, and that no weapons were involved. (Doc. 62-3; Doc. 48-2 at 12:6-13:5; Doc. 48-3 at 8:10-22.) The Officers were also advised to approach with caution because the son suffered from mental illness. (Jaramillo Dep., Ex. 1 at 15:2-8, 26:16-21, Doc. 62-1.) At the house, Ms. Perea and her boyfriend apprised Officer Jaramillo that Jerry Perea had left on a bicycle. (Doc. 48-2 at 17:4-14.) Ms. Perea and her boyfriend did not state that they had been injured, threatened, or were afraid for their safety. (Doc. 62-1 at 18:1-19:11.) The couple only said that Jerry Perea was "acting up" and they were afraid for his welfare. (Doc. 48-2 at 17:4-14.)

Although the Defendant Officers recognized that the underlying reason for their dispatch had "dissipated," Officers Jaramillo and Baca returned to their cruisers to find Jerry Perea in case he was a danger to himself. (Doc. 62-1 at 22:17-23:20, 27:16-24, 28:9-14; Doc. 48-3 at 12:16-13:20.) When Officer Jaramillo spotted Mr. Perea, he approached the bicycle with the marked police car. (Doc. 62-1 at 22:17-23:20.) Mr. Perea saw the police car and pedaled faster. (*Id.*) Officer Jaramillo turned on his emergency lights and sirens. (Doc. 62-1 at 24:7-10.) Mr. Perea did not stop and pedaled through a stop-sign-controlled intersection without slowing down. (Doc. 62-1 at 24:7-15, 25:7-10; Doc. 51 at 11.)

The Defendant Officers cornered Mr. Perea in a parking lot. (Doc. 62-1 at 24:16-21.) Officer Jaramillo got out of the car and began to pursue Mr. Perea on foot. (*Id.*) Mr. Perea came to a fence and had to slow his pedaling. (Doc. 62-1 at 29:21-23.) Officer Jaramillo pushed Mr. Perea, causing him to fall from his bicycle. (Doc. 62-1 at 30:5-10.) Plaintiffs note that the

Officer never made a verbal statement to Mr. Perea to explain why he was being seized. (Doc. 62-1 at 31:24-25.)

Officer Jaramillo attempted to grab Mr. Perea's hands. (Doc. 48-2 at 30:7-10.) Mr. Perea resisted the seizure, armed only with a crucifix. (Doc. 62-1 at 30:11-23.) Officer Baca arrived to help subdue Mr. Perea. (Doc. 48-3 at 18:3-13.) Officer Jaramillo used his Taser, initially on probe mode, to incapacitate Mr. Perea by tasering him in the chest. (Doc. 62-1 at 33:9-17.) The initial tasering was ineffective. (*Id.*) Mr. Perea struck Officer Baca on the head with the crucifix. (Doc. 48-3 at 21:7-9.) Officer Jaramillo shifted the Taser into "contact" mode and directly applied the Taser to Mr. Perea's person in order to induce compliance through pain. (Doc. 48-2 at 36:9-16, 44:21-22.) He proceeded to taser Mr. Perea an additional nine times in less than two minutes. (Doc. 48-2 at 64:19-23.) The Officers were finally able to get Mr. Perea handcuffed. (Doc. 48-2 at 45:9-12.) Officer Baca called an ambulance and a supervisor to the scene because they had used a Taser. (Doc. 48-3 at 21:11-15.)

While the Officers were catching their breath, they noticed that Mr. Perea had stopped breathing and was turning gray. (Doc. 48-2 at 47:4-8; Doc. 43-3 at 22:13-23.) The Officers began to perform CPR. (Doc. 48-2 at 51:7-12.) Due to their efforts, Mr. Perea began breathing again. (Doc. 48-2 at 51:9-14.) Immediately after the Defendant Officers resuscitated Mr. Perea, he was calm and apologized. (Doc. 48-2 at 51:15-20.) When Mr. Perea heard the sirens from the ambulance, he again began to struggle and started to scream and ask God for forgiveness. (Doc. 48-2 at 51:21-52:5, 53:4-7.) While the paramedics attempted to attend to the struggling Mr. Perea, he again stopped breathing and the paramedics were unable to detect a pulse. (Doc. 48-2 at 55:16-24; Doc. 48-3 at 24:18-23; Doc. 62-3 at 3.) He was transported to a hospital where he was pronounced dead at 11:08 a.m. (Ex . J, Doc. 48-9.)

Plaintiffs, the co-representatives of Mr. Perea's estate, filed a complaint alleging civil rights violations and state tort violations. (Third Am. Compl, Doc. 21, amending Doc. 1.) Defendants moved for summary judgment. (Doc. 48.) Plaintiffs opposed the motion relying heavily on a report from their retained expert. (Doc. 51.) In their Reply, the Defendants ask the Court to disregard the report as untimely under the discovery deadlines. (Doc. 54 at 2-4.) The Court declines the Defendants' request. The Defendants were not prejudiced by the untimely report. They had timely notice of the expert's name and his intended report. (Order Granting Plaintiffs' Unopposed Motion to Accept Expert Witness as Timely, Doc. 42.) If the Defendants wish to bring a *Daubert* motion, they can do so in a motion *in limine*.

## II. LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). If there is a genuine dispute of material fact, then the "facts must be viewed in the light most favorable to the nonmoving party . . . ." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## III. DISCUSSION

Plaintiffs bring an excessive force claim against the Defendant Officers, an unconstitutional policy and custom claim against Albuquerque, and a wrongful death claim under New Mexico statutory law. (Doc. 21.) Defendants challenge each claim. (Doc. 48.)

### A. Excessive Force

Defendants argue that the Plaintiffs' excessive force claim must fail because they are protected by qualified immunity. (Doc. 48 at 9-10.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).

To determine whether qualified immunity applies, courts consider two questions. *See id.* at 236 (explicating the two-prong inquiry for qualified immunity). First, did the defendant's actions violate the decedent's constitutional rights? *See id.* Second, was the complained-of constitutional violation "clearly established" such that a reasonable officer would have known that his conduct was unlawful? *See Saucier v. Katz*, 533 U.S. 194, 202 (2001). When considering qualified immunity on summary judgment, courts must take care to view the facts in the light most favorable to the plaintiff. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

Plaintiffs claim that the officers violated Mr. Perea's constitutional rights by pushing him from his bicycle and by tasering him ten times. (Doc. 21 at 5; Doc. 51 at 9.) Claims that law-enforcement officers used excessive force are governed by the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). Courts must judge the reasonableness of a particular use of force

"from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (quoting same). The three factors courts examine are (1) the severity of the crime at issue; (2) whether the decedent posed an immediate threat to the safety of the officers or others; and (3) whether the decedent actively resisted arrest or attempted to evade arrest by flight. *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1249 (10th Cir. 2013) (citing *Graham*, 490 U.S. at 396).

   1. *The Push*

After cornering him in the parking lot, Officer Jaramillo pushed Mr. Perea and caused him to fall from his bicycle. (Doc. 62-1 at 30:5-10.) Plaintiffs claim that the Defendant Officers had no lawful purpose for arresting Mr. Perea and thus any force used against him was unreasonable. (Doc. 51 at 10-11.)

Defendants contend that the push was a reasonable exercise of force under *Graham*. (Doc. 48 at 12.) First, looking to the severity of the crime, Defendants argue that the prior domestic disturbance gave the Defendant Officers reasonable suspicion to stop Mr. Perea. (Doc. 48 at 13.) They further argue that Officer Jaramillo had an additional reason to detain Mr. Perea when, in response to hearing the Officer's emergency siren, he broke traffic laws by riding his bike through a stop sign without slowing down. (Doc. 48 at 13.) Second, on the threat prong, the Defendant Officers feared that Mr. Perea might be a danger to himself and others given his erratic behavior and reckless cycling. (Doc. 48 at 14.) Finally, on the evasion prong, Defendant Jaramilllo pushed the fleeing Mr. Perea because it was an effective way to separate him from the bicycle. (Doc. 48 at 14.)

Plaintiffs do not contest any of the facts underlying the Defendants' argument. They only argue that the seizure was not valid because after Jerry Perea fled, Ms. Merlinda Perea was no

longer in harm's way. (Doc. 51 at 11-12.) Considering the facts presented here upon summary judgment—that Merlinda Perea and her boyfriend were unharmed and did not report any continuing fear for their safety—Ms. Perea and her boyfriend may not have been in danger. However, in the Court's evaluation of the uncontested facts, the Defendant Officers did have a valid reason to conduct an investigatory stop based on Plaintiff Merlinda Perea's stated concerns over the welfare of her son. (Doc. 48-2 at 17:4-14.) Additionally, as argued by Defendants, the Officers had further reason to stop Mr. Perea after he violated traffic laws on his bicycle. (Doc. 51 at 11.) Moreover, "in an excessive force inquiry, we ask whether the force used would have been reasonably necessary *if the arrest or the detention were warranted*." *Morris*, 672 F.3d at 1195 (quotations omitted).

Given the totality of the circumstances, the push did not violate Mr. Perea's constitutional rights. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396; *see also Cavanaugh*, 718 F.3d at 1252 (quoting same). The government had an interest in stopping Mr. Perea and the push was an effective, minimally-intrusive way to separate Mr. Perea from the instrument he was using to evade the police. The Defendant Officers are entitled to qualified immunity on the claim that the push was an excessive use of force.

   2. *The Ten Taserings*

After the two Defendant Officers backed Mr. Perea up against a fence, Defendant Jaramillo tasered the decedent ten times in less than two minutes. (Doc. 48-2 at 64:19-23.) He died shortly thereafter. (Doc. 48-2 at 55:16-24; Doc. 48-3 at 24:18-23; Doc. 62-3 at 3.)

Defendants argue that the taserings were justified given that Mr. Perea resisted the Officers and battered them with a crucifix. (Doc. 48 at 16-17.) Plaintiffs contend, first, that given Officer Jaramillo's knowledge that Mr. Perea may have suffered from mental illness, the Officers should have approached Mr. Perea in a less threatening manner. (Doc. 51 at 14.) Plaintiffs note that the Defendant Officers never attempted to talk to Mr. Perea or explain their purpose before the physical altercation began. (Doc. 62-1 at 31:24-25.) A less threatening approach, Plaintiffs argue, could have lessened the amount of resistance they encountered. (Doc. 51 at 14.) Second, Plaintiffs argue that tasering anyone ten times in less than two minutes is excessive and a misuse of the Taser. (Doc. 51 at 13.) The Plaintiffs' expert suggests that multiple Taser activations increase the risk of death. (Doc. 63-1 at 9.)

Turning to the *Graham* factors, first, the severity of the crime, if any, does not justify a significant use of force. The Officers set out to perform a welfare check and subsequently witnessed a bicycle traffic violation. The Officers had neither probable cause nor reasonable suspicion that Mr. Perea had committed a serious crime. The government was justified in using minimal force, such as a push, but not necessarily justified in using more substantial force.

The Defendants emphasize the second and third *Graham* factors—the threat that the decedent posed and his attempts to flee. Defendants note that Mr. Perea resisted the Officers, battered them with a crucifix, and evaded them. (Doc. 48 at 16-17.) To justify escalating the amount of force from a push to ten taserings, the government has to show a significant interest in using increased force. When "the nature and quality of the intrusion" is significant, it requires a "heightened showing of countervailing governmental interests to justify the intrusion." *Wilson v. City of Lafayette*, 510 F. App'x 775, 778 (10th Cir. 2013) (citing *Graham*, 490 U.S. at 396). In short, if the amount of force increases, the government's interest in using force must be stronger.

Arguably, Mr. Perea posed a greater threat and flight risk during the push than during the taserings. During the push, one officer was facing off against a suspect who was attempting to flee on a bicycle. (Doc. 62-1 at 30:5-10.) During the taserings, two officers had an unarmed Mr. Perea backed up against a fence. (Doc. 48-3 at 18:1-13.)

The Court is sensitive to the fact that the Defendant Officers were in a tense situation. Given Mr. Perea's resistance, the Defendant Officers may well have been justified in tasering Mr. Perea the first time. *See Graham*, 490 U.S. at 396 (finding that officers have the right to "use some degree of physical coercion" to effect an investigatory stop). The Officers may have been justified in tasering Mr. Perea a second time. Ten taserings in less than two minutes, however, veers into the realm of abuse. The Albuquerque Police Department is aware of the dangers of the Taser, as evidenced by the fact that they call an ambulance whenever they deploy the Taser. (Doc. 48-3 at 21:11-15.) Defendants' expert opines that "[t]here is a great deal of unwarranted concern of electrocution based on lay misunderstanding" of the Taser. (Doc. 48-4 at 6.) The Plaintiffs' expert, on the other hand, posits that multiple Taser activations increase the risk of death. (Doc. 63-1 at 9.) At the summary judgment stage, the Court must view the facts in the light most favorable to the Plaintiffs. Accordingly, the *Graham* factors do not justify Officer Jaramillo's decision to Taser Mr. Perea ten times.

Notwithstanding the unjustified force, the Defendant Officers argue that they are immune because there was no clearly established Tenth Circuit law saying that tasering an actively resisting suspect ten times is unlawful. (Doc. 48 at 18-19.) Finding clearly established law is tricky given that Tasers are a relatively new technology and the case law is evolving. More to the point, though, "the qualified immunity analysis involves more than 'a scavenger hunt for prior cases with precisely the same facts.'" *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666

9

(10th Cir. 2010) (quoting *Casey v. Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Even if there are no similar prior cases, a court "may conclude a constitutional right was clearly established . . . if the force is clearly unjustified based on the *Graham* factors." *Morris v. Noe*, 672 F.3d 1185, 1197-98 (10th Cir. 2012). If an officer's actions manifest obvious excess then the practice should have provided the officer with some notice that his conduct violated the constitutional protections against excessive force. *See Hope*, 536 U.S. at 745 ("The obvious cruelty in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment.").

Determining qualified immunity in Taser cases requires an in-depth analysis of the facts. *Cf. Porro v. Barnes*, 624 F.3d 1322, 1329 (10th Cir. 2010) (finding that tasering can be constitutional in "at least *some* circumstances"). Defendants point to two Tenth Circuit cases where officers were justified in tasering resisting suspects one to three times. *See Wilson*, 510 F. App'x at 776 (suspect holding box cutter tasered one time); *Hinton v. Elwood*, 997 F.2d 774, 781 (10th Cir. 1993) (suspect tasered three times after he shoved and bit police officer). Conversely, other Tenth Circuit precedent establishes that tasering an unarmed, non-violent misdemeanant, even one time, is unlawful without first giving warning. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 663, 667 (10th Cir. 2010) (unlawful to taser a woman who had been involved in a physical domestic dispute and was earlier seen with a knife); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (unlawful to taser a man without warning even when a second officer was attempting to tackle the man).

The situation here shares facts with both lines of cases. Similar to the misdemeanants in the unlawful tasering cases, Mr. Perea was unarmed, was suspected of a misdemeanor, and was not given any verbal commands before the officer used physical force against him. Similar to the suspects in the lawful tasering cases, Mr. Perea did resist arrest when he was pushed and grabbed, but in both *Wilson* and *Hinton*, the Tenth Circuit is careful to note that the suspect initiated the force. *See Hinton*, 997 F.2d at 781; 510 F. App'x at 776. Here, Mr. Perea did not start the physical struggle; Officer Jaramillo began the physical engagement when he pushed Mr. Perea and then tried to seize his hands. (Doc. 62-1 at 30:5-10; Doc. 48-2 at 30:7-10.) Before pushing him, Officer Jaramillo never asked Mr. Perea to halt or to stop. (Doc. 62-1 at 31:24-25.) The Defendants' witnesses point out that Mr. Perea "seemed kind of scared" and was not actively "swinging at" the officers, but attempting to "remove himself from the police officer" and "trying to keep [the officers] away" by not giving the officers his arms. (Ex. H at 10:7-11:14, Doc. 48-7; Ex. I at 14:1-7, Doc. 48-8.)

Moreover, the situation was not static over the course of the ten taserings. When Officer Jaramillo first engaged the Taser, he shot Mr. Perea in the chest. (Doc. 48-3 at 19:8-17.) At the time, Mr. Perea was trying to ward off the officers with his crucifix. This may well have been justified use of force. At some point, however, Mr. Perea fell and the officers pushed him to the ground with his arms under his body. (Doc. 48-2 at 48:12-19, 65:14-15.) One officer was on "the upper part of his body" while the second officer was on his legs. (Ex. G, 13:5-10, Doc. 48-6.) Officer Jaramillo continued to taser Mr. Perea in the back again and again until he pulled his arms out and handcuffed both hands. (Doc. 62-1 at 47:19-48:1.) Considering the facts in the light most favorable to Plaintiffs, while Mr. Perea was prone on the ground with his arms pinned beneath him, he was no longer posing an immediate threat to the Officers. Yet Officer Jaramillo

tasered Mr. Perea in the back nine times. (Doc. 61:13-22.) Such force is clearly disproportionate to the threat Mr. Perea posed—disproportionate force is the hallmark of excessive force. *Cf. Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) (holding that while it was reasonable to roughly frisk a detainee during an investigatory stop, it was not reasonable to then hit, choke or beat the detainee who had his back to the officers and his hands on a van); *Porro v. Barnes*, 624 F.3d 1322, 1324 (10th Cir. 2010) (upholding a finding that it was unlawful to taser a detainee after he was restrained). Once an unarmed, suspected misdemeanant is subdued in a prone position, no objectively reasonable officer would have considered additional, repeated taserings necessary or lawful.

In sum, Plaintiffs met their two-prong burden to overcome qualified immunity. Viewing the facts in the light most favorable to them, Plaintiffs can show that the Defendants' use of force violated Mr. Perea's constitutional rights. Furthermore, the Officers were on notice that tasering an unarmed misdemeanant a total of ten times without prior warning, especially after the misdemeanant was effectively subdued, was unlawful. Thus, the Defendant Officers are not entitled to qualified immunity on this claim, nor are they entitled to summary judgment.

### B. Municipal Liability

Plaintiffs argue that the Albuquerque Police Department has engaged in a pattern and practice of civil rights abuses through excessive force. (Doc. 51 at 15.) If a governmental entity has a policy or custom that has "inflict[ed] the injury" on a plaintiff, then "the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694. Plaintiffs also named the Defendant Officers in their official capacities. Official-capacity suits "represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quotation marks omitted). "Because the real party in interest in an

official-capacity suit is the governmental entity and not the named official, the entity's 'policy or custom' must have played a part in the violation of federal law." *Id.*

### 1. *Admissibility of Hearsay*

The only evidence the Plaintiffs use to support their custom or practice claim is an excerpt from a United States Department of Justice ("DOJ") report to the Albuquerque mayor. (Doc. 51 at 15-16.) The Defendants object that it is not admissible evidence under Federal Rule of Civil Procedure 56(c). (Reply, Doc. 54 at 7.) The Court agrees that the report is hearsay that must be covered under a hearsay exception to be deemed admissible. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1121 (10th Cir. 2007) (finding a court may not use hearsay evidence to defeat summary judgment).

The Federal Rules of Evidence permit the admission of public records so long as they do not "indicate a lack of trustworthiness." Fed. R. Evid. 803(8). Under the Rules, a report is admissible in a civil action if it sets forth "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). The description fits the DOJ report well. The Rule is written to "assume[] admissibility in the first instance" for these records. *Id.* at cmt. 8(c).

Defendants argue the report lacks trustworthiness. (Doc. 54 at 8.) In determining "trustworthiness" under 803(8), the Tenth Circuit looks to four factors: (1) the timeliness of the investigation; (2) the special skill or experience of the investigator; (3) whether a hearing was held; and (4) possible motivation problems. *See Denny v. Hutchinson SalesCorp.*, 649 F.2d 816, 821 (10th Cir. 1981) (quoting the Advisory Committee's Notes to the Federal Rules). In accord with the recent decision in *Barr v. Albuquerque*, No. 12-cv-1109 (D.N.M. Aug. 22, 2014), the Court finds that the report is not untrustworthy and is admissible under 803(8).

The first factor, timeliness, weighs in favor of admission. The DOJ investigated the excessive force in the Albuquerque Police Department between 2009 and 2013. (Report at 3.) The report was issued on April 10, 2014. (*Id.* at 1.) Nothing about the timing of the investigation indicates untrustworthiness.

The second factor, the special skill or experience of the official, also favors admission. The DOJ Civil Rights Division and the United States Attorney's Office for the District of New Mexico partnered to conduct the investigation. *Barr*, No. 12-cv-1109, slip op. at 4. "Officials in those organizations possess both special skill and experience in evaluating the conduct of law enforcement personnel against constitutional standards." *Id.*

The third factor, whether a hearing was held, neither suggests nor undermines trustworthiness. While the investigators did not hold a formal hearing, the investigation appears balanced. *See id.* at 4-5. The report draws from many sources, including "extensive cooperation and participation" from the City of Albuquerque, the Albuquerque Police Department, and other stakeholders. (Report at 2.) The investigators held four town hall meetings, conducted site visits, reviewed hundreds of reports, and interviewed hundreds of people. (*Id*. at 7.) Although the City of Albuquerque did not have the benefit of cross-examining the DOJ, the process was sufficiently open and cooperative. *See Barr*, No. 12-cv-1109, slip op. at 5. This factor does not require a finding against trustworthiness.

The final factor, possible motivation problems, also does not weigh against trustworthiness. *Id.* The Defendants offer no evidence to suggest that the DOJ had an improper motivation. Moreover, the City and the DOJ agreed to cooperate on the issues and recently entered into a settlement agreement. (DOJ, Remarks by U.S. Attorney Damon P. Martinez, 2014 WL 5489169, Oct. 31, 2014.)

The Court finds that the letter is admissible hearsay under Rule 803(8). Admitting this report, however, does not relieve the Plaintiffs of their burden to show that the City of Albuquerque had an unlawful custom or practice that led to the decedent's injuries.

### 2. *Unlawful Custom or Practice*

Plaintiffs must establish three elements to sustain their unlawful custom or practice claim. They most show (1) an unlawful custom or practice, (2) causation, and (3) deliberate indifference. *Schneider v. Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). The Supreme Court cautions that "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997).

A policy or practice must be "so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)); *see also Bryson v. City of Oklahoma City*, 627 F.3d 784, 791 (10th Cir. 2010). Plaintiffs lean on two findings from the DOJ letter:

> We find that officers frequently misused electronic control weapons (commonly referred to by the brand name "Tasers"), resorting to use of the weapon on people who are passively resisting, observably nonthreatening but unable to comply with orders due to their mental state, or posed only a minimal threat to the officers.

(Report at 3 (footnotes omitted).) And somewhat repetitiously:

> There is a pattern of APD officers using force that is unnecessary and unreasonable against individuals who pose little, if any, threat, or who offer minimal resistance. Officers too precipitously resort to the use of Tasers, prone restraints (referred to as "face-down stabilization techniques" by APD), leg sweeps, front kicks, face-down arm-bar takedowns, and strikes to legs and thighs. We reviewed incidents where officers applied force against individuals who were unable to understand or yield to commands but posed a minimal threat to the officers. Many subjects of excessive force had indications of mental illness, physical disabilities, intoxication, and other incapacity. In most instances, these individuals were engaging in lawful activities or committing minor infractions.

(Report at 15.)

The report suggests that the practice was widespread and well-settled within the Department. Arguably, the City failed to take action to prevent a continued pattern of unconstitutional conduct. Although not conclusive, the evidence in the report raises a genuine dispute.

Additionally, Plaintiffs must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. Plaintiffs argue that the Albuquerque Police Department engaged in a pattern and practice of civil rights abuses and that Mr. Perea's death is a part of the overall practice. The DOJ's findings regarding excessive Taser-use against non-threatening individuals who manifest indications of mental illness align closely with the facts of this case. Plaintiffs' causation theory seems to be that the custom was pervasive in Albuquerque and the City failed to take steps to prevent it. Had the City earlier taken steps to reprimand, train, or otherwise end the pattern of violations, arguably Mr. Perea would not have died during his confrontation with the Defendant Officers. Given the close link between the report's findings and the facts of this case, Plaintiffs raise a genuine dispute of fact regarding the City's inaction and the deprivation of Mr. Perea's rights. *See Layton v. Bd. of Cnty. Comm'rs*, 512 F. App'x 861, 872 (10th Cir. 2013).

Finally, for state of mind, Plaintiffs "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 407); *Kramer v. Wasatch Cnty. Sheriff's Office*, 743

16

F.3d 726, 759 (10th Cir. 2014) ("Where a plaintiff seeks to create § 1983 municipal liability for failing to prevent the bad acts of a subordinate, the plaintiff must show that the municipality evidenced 'deliberate indifference' to the impermissible conduct."). This standard "may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* at 771. "[N]otice can be established by proving the existence of a pattern of tortious conduct." *Id.* The crucial question here becomes: when did Albuquerque become aware of this pattern of excessive force? Certainly, the City was aware after the letter was issued and maybe even when the DOJ initiated the investigation in 2013. However, was the City aware of the pattern of tortious conduct in March 2011 when Mr. Perea died? If the City was not aware of the pattern of tortious conduct in 2011, it cannot be held liable for failing to act. The evidence, at this point, does not demand judgment as a matter of law for either party. This issue is ripe for a jury to determine.

Plaintiffs raised a genuine dispute of material fact regarding what the City of Albuquerque knew and can be held liable for regarding the Albuquerque Police Department's pattern of excessive force. Plaintiffs thus defeat the motion for summary judgment on this claim.

### C. Wrongful Death

Plaintiffs initiated a state wrongful death action pursuant to the New Mexico Tort Claims Act. Plaintiffs allege that the Defendant Officers' use of excessive force led to the decedent's wrongful death. (Doc. 21 at 5.) The New Mexico Wrongful Death Act is a survival statute that provides relief for decedents whose death was caused "by the wrongful act, neglect or default of another . . . ." N.M. Stat. Ann. § 41-2-1. Defendants argue that the Defendant Officers'

"immunity has not been waived because 'excessive force' is not a tort listed under Section 41-4-12 for which immunity has been waived." (Doc. 48 at 21.)

Government entities and employees are immune from tort suits unless their immunity is waived by the New Mexico Tort Claims Act. N.M. Stat. Ann. § 41-4-4(A). The Act expressly states that police officers who were acting within the scope of their duties are not immune from liability for "wrongful death . . . resulting from . . .[the] deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico . . . ." N.M. Stat. Ann. § 41-4-12. Plaintiffs' claim that the Defendant Officers caused the wrongful death of Mr. Perea in violation of his Fourth Amendment rights against unreasonable seizures falls squarely within this exception.

To prevail in the wrongful death claim, Plaintiffs will need to apply "the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2. Specifically, police officers "have a duty to exercise that care ordinarily exercised by reasonably prudent officers in similar circumstances." *Torres v. State*, 894 P.2d 386, 391 (N.M. 1995) (applying traditional tort concepts to a plaintiff's wrongful death claim brought under the New Mexico Tort Claims Act). Under New Mexico law, "the doctrine of respondeat superior extends liability to the public entities that have supervisory control over the tortious actors." *Weinstein v. Santa Fe*, 916 P.2d 1313, 1318 (N.M. Ct. App. 1996) (citing *Silva v. State*, 745 P.2d 380, 385 (N.M. 1987)). Plaintiffs raised a genuine dispute of material fact regarding whether the Defendant Officers breached their duty of care by tasering Mr. Perea ten times in less than two minutes. As a result, summary judgment is inappropriate on the wrongful death claim.

## IV. CONCLUSION

Plaintiffs raised a genuine dispute of material fact regarding the Defendant Officers' alleged use of excessive force by tasering Mr. Perea ten times in less than two minutes. The Court found that the Defendant Officers were not shielded from liability by qualified immunity on the excessive force by tasering claim. Thus, Defendants' Motion for Summary Judgment is denied with respect to the Section 1983 claim for excessive force by repeated tasering. Similarly, Plaintiffs raised a genuine dispute of fact regarding the wrongful death claim under New Mexico state law. In contrast, the Defendant Officers are entitled to qualified immunity with respect to the Section 1983 claim based on Officer Jaramillo's push. Finally, Plaintiffs produced sufficient evidence to support their Section 1983 policy and custom claim against the City of Albuquerque and the Defendants in their official capacities. Defendants are not entitled to summary judgment on that claim.

**THEREFORE**,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 48) is **GRANTED** in part and **DENIED** in part.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**